**RECORD NO. 22-1406**

In The

# United States Court of Appeals

### For The Fourth Circuit

**TERESA D. NIXON,**

*Plaintiff – Appellant,*

**v.**

**KYSELA PERE ET FILS, LTD.;**
**FRANCIS J. KYSELA, V,**

*Defendants – Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**AT HARRISONBURG**

———————

**BRIEF OF APPELLANT**

———————

John C. Cook
Philip C. Krone
COOK CRAIG & FRANCUZENKO, PLLC
3050 Chain Bridge Road, Suite 200
Fairfax, Virginia 22030
(703) 865-7480

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 22-1406        Caption: Teresa D. Nixon v. Kysela Pere et Fils, LTD; Francis Kysela

Pursuant to FRAP 26.1 and Local Rule 26.1,

Teresa D. Nixon
(name of party/amicus)

who is _____ appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.  Does party/amicus have any parent corporations?   ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?          ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?          ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?          ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ John C. Cook _____          Date: _____4/28/2022_____

Counsel for: Teresa D. Nixon, Appellant _____

- 2 -

Print to PDF for Filing

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES............................................................2

STATEMENT OF THE CASE...............................................................3

    Background ...................................................................................3

    Actionable Facts ..........................................................................4

    Procedural History .......................................................................8

SUMMARY OF ARGUMENT ..............................................................9

STANDARD OF REVIEW ..................................................................11

ARGUMENT ......................................................................................12

I.    THE DISTRICT COURT ERRED IN FINDING NIXON COULD NOT HAVE BEEN TERMINATED "BECAUSE OF SEX" BY FAILING TO GIVE PROPER CONSIDERATION TO EVIDENCE OF SEXUAL ADVANCES AND BY APPLYING AN INCORRECT LEGAL STANDARD UNDER WHICH NO EMPLOYEE ENDING A SEXUAL RELATIONSHIP WITH A SUPERVISOR COULD RETAIN A CLAIM OF RETALIATORY DISCHARGE UNDER TITLE VII.................................................................................................12

    A.    A Reasonable Jury Could Find that KPF Terminated Nixon Because She Rejected Kysela's Unwelcome Sexual Advances, in the Course of Ending the Sexual Relationship Between the Two, in Violation of Title VII ........16

i

1. There was an unwelcome sexual advance in August 2019 ...............................................................................17

2. There was an unwelcome sexual advance on September 24, 2019 .......................................................19

3. The continued sexual advances in the September 24-25 exchange...............................................22

B. The District Court Applied an Unworkable and Incorrect Standard in Determining Whether Nixon's Termination was "Because of Sex" Under Title VII ....................................24

C. The Court Should Adopt a Clearer and Simpler Definition of "Because of Sex" Based on the Plain Meaning of the Statute, Under Which Nixon's Termination, Admittedly "Because of" the Ending of a Sexual Relationship, was "Because of Sex." ....................................................31

II. THE TRIAL COURT IMPROPERLY GRANTED SUMMARY JUDGMENT ON NIXON'S BREACH OF CONTRACT CLAIM BECAUSE THERE ARE QUESTIONS OF FACT AS TO WHETHER NIXON'S TERMINATION BREACHED THE EMPLOYMENT AGREEMENT ......................................38

III. THE DISTRICT COURT ERRED IN RULING THAT ALLEGATIONS OF KYSELA'S REPEATED INVITATIONS FOR SEX, AND THE IMPLICIT THREAT OF EMPLOYMENT TERMINATION IF THE REQUESTS WERE REFUSED, COULD NOT CONSITUTE A VIABLE CLAIM OF SEVERE OR PERVASIVE HOSTILE WORK ENVIRONMENT BASED ON SEX IN VIOLATION OF TITLE VII .................................................................39

CONCLUSION ....................................................................43

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ii

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144, 90 S. Ct. 1598 (1970) ............................................................17

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)............................................................................11, 17

*Bostic v. Schaefer*,
    760 F.3d 352 (4th Cir. 2014) .......................................................................11

*Bostock v. Clayton Cnty., Georgia*,
    140 S. Ct. 1731 (2020)................................................................31, 32, 36

*Briggs v. Waters*,
    484 F. Supp. 2d 466 (E.D. Va. 2007) ....................................................14, 17

*Burlington Industries, Inc. v. Ellerth*,
    524 U.S. 742 (1998)................................................................13, 14, 15, 42

*Carter v. Ball*,
    33 F.3d 450 (4th Cir. 1994) .........................................................................24

*Coursey v. Univ. of Maryland E. Shore*,
    577 F. App'x 167 (4th Cir. 2014)................................................................24

*EEOC v. Appalachian Power Co.*,
    Case No. 1:18CV00035,
    2019 WL 4644549 (W.D. Va. Sept. 24, 2019).............................................14

*Emmerson v. Fay*,
    94 Va. 60, 26 S.E. 386 (1896) .....................................................................38

*Ford v. Simms*,
    23 F. App'x 152 (4th Cir. 2001) (unpublished) ......................................15, 29

iii

*Fredette v. BVP Mgmt. Assocs.*,
    112 F.3d 1503 (11th Cir. 1997) ....................................................25

*Henry v. Purnell*,
    652 F.3d 524 (4th Cir. 2011) ........................................................11

*Henson v. City of Dundee*,
    682 F.2d 897 (11th Cir. 1982) ......................................................25

*Howerton v. Bd. of Educ. of Prince George's Cty.*,
    No. CIV.A. TDC-14-0242,
    2015 WL 4994536 (D. Md. Aug. 19, 2015) ..................................42

*King v. Rumsfeld*,
    328 F.3d 145 (4th Cir. 2003) ........................................................24

*Libertarian Party of Va. v. Judd*,
    718 F.3d 308 (2013) .....................................................................11

*MacCoy v. Colony House Builders, Inc.*,
    239 Va. 64, 387 S.E.2d 760 (1990) ..............................................38

*McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*,
    780 F.3d 582 (4th Cir. 2015) ........................................................12

*Med. Waste Assocs. Ltd. v. Mayor & City Council of Baltimore*,
    966 F.2d 148 (4th Cir. 1992) ........................................................11

*Mercantile Peninsula Bank v. French*,
    499 F.3d 345 (4th Cir. 2007) ........................................................11

*Meritor Savings Bank, FSB v. Vinson*,
    477 U.S. 57 (1986).......................................................................13

*Minarsky v. Susquehanna County*,
    895 F.3d 303 (2018) .....................................................................33

*Moberly v. Midcontinent Commc'n*,
    711 F. Supp. 2d 1028 (D.S.D. 2010) ............................................15

iv

*Moron v. Va. Polytechnic Inst. & State Univ.*,
    508 F. App'x 226 (4th Cir. 2013) ................................................................42

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ......................................................................12

*Newton v. Cadwell Labs.*,
    156 F.3d 880 (8th Cir.1998) .......................................................................25

*Okoli v. City of Balt.*,
    648 F.3d 216 (4th Cir. 2011) ......................................................................14

*Oncale v. Sundowner Offshore Services, Inc.*,
    523 U.S. 75 (1998) ......................................................................................42

*Pipkins v. City of Temple Terrace, Fla.*,
    267 F.3d 1197 (11th Cir. 2001) .............................................................28, 32

*Reynolds v. Am. Nat. Red Cross*,
    701 F.3d 143 (4th Cir. 2012) ......................................................................11

*Tenge v. Phillips Modern Ag. Co.*,
    446 F.3d 903 (8th Cir. 2006) ...........................................................27, 28, 32

*Thomas v. Sw. Virginia Transit Mgmt. Co., Inc.*,
    No. 7:19-CV-00652,
    2020 WL 3237977 (W.D. Va. June 15, 2020) ...........................................14

*Tolan v. Cotton*,
    572 U.S. 650 (2014) ....................................................................................11

*University of Tex. Southwestern Medical Center v. Nassar*,
    570 U.S. 338, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013) ..........................31

*Vance v. Ball State Univ.*,
    570 U.S. 421 (2013) ....................................................................................33

*West v. MCI Worldcom, Inc.*,
    205 F. Supp. 2d 531 (E.D. Va. 2002) .............................................1, 27, 30, 32

## STATUTES

28 U.S.C. § 1291 ................................................................................ 1

28 U.S.C. § 1331 ................................................................................ 1

28 U.S.C. § 1367 ................................................................................ 1

42 U.S.C. §§ 2000e, *et seq* ............................................................... 1

42 U.S.C. § 2000e-2(a)(1) ................................................................ 13

## RULES

Fed. R. Civ. P. 56(a) ........................................................................ 11

Fed. R. Civ. P. 12(b)(6) ................................................................... 39

## REGULATIONS

29 C.F.R. § 1604.11(a) ................................................................ 15, 25

29 C.F.R. § 1604.11(b) ..................................................................... 18

## OTHER AUTHORITY

*Blue-Collar Blues: The Sexual Harassment of Women Autoworkers*,
9 Work & Occupations 271 (1982) .................................................. 33

Bravo & Cassedy,
*The 9 to 5 Guide to Combating Sexual Harassment* (1992) ................... 33

MacKinnon,
*Sexual Harassment of Working Women* (1979) ................................... 33

Sexual Gender Policy 2021,
*What to do about #MeToo? Consent, autonomy, and restorative justice:*
*A case study*, Tina Sikka, PhD.
https://onlinelibrary.wiley.com/doi/epdf/10.1002/sgp2.12027 ..............................35

*The Implications of Admitting Evidence of a Sexual Harassment Plaintiff's Speech*,
41 UCLALR (1993)................................................................................................33

## JURISDICTIONAL STATEMENT

The United States District Court for the Western District of Virginia, Harrisonburg Division, held federal-question jurisdiction over the Appellant-Plaintiff, Teresa Nixon's, Complaint based on 28 U.S.C. § 1331 because the Complaint alleged violations of Title VII of the Civil Rights Act of 1964, §§ 701, *et seq.*, as amended; 42 U.S.C. §§ 2000e, *et seq*. The District Court had supplemental jurisdiction over the Complaint's remaining state law claims based on 28 U.S.C. § 1367 because those claims formed part of the same case or controversy as the claims which originally brought the case to federal court. On August 19, 2021, the District Court, Judge Cullen presiding, granted in part and denied in part the Appellee-Defendants, Kysela Pere et Fils, LTD ("KPF") and Francis J. Kysela's ("Kysela"), motion to dismiss Nixon's second amended complaint. (JA151-59). Specifically, the District Court dismissed Nixon's Title VII hostile work environment claim. On March 17, 2022, the District Court, Judge Cullen presiding, granted summary judgment for KFP and Kysela on the remaining claims. (JA1203-35). On April 13, 2022, Nixon noticed her appeal of the March 17, 2022, and August 19, 2021 orders.  (JA1236). This Court has jurisdiction over the District Court's order based on 28 U.S.C. § 1291 because Nixon has appealed from a final order of the District Court.

## **STATEMENT OF THE ISSUES**

**Issue 1.**  Whether the District Court erred in awarding summary judgment to Appellees as to Appellant's Title VII quid pro quo discrimination claim by failing to consider evidence that the Appellant rejected as many as three sexual advances from Appellee, causing her termination.

**Issue 2.**  Whether the Court incorrectly endorsed and expanded the post-relationship unwelcome advance requirement in Title VII quid pro quo discrimination claims set forth in *West v. MCI Worldcom, Inc.*, 205 F. Supp. 2d 531, 545 (E.D. Va. 2002), effectively taking away any retaliatory discharge claim from an employee who ends a sexual relationship with her supervisor.

**Issue 3.**  Whether the allegation of an ongoing or lingering threat of termination in conjunction with an ongoing sexual relationship between supervisor and subordinate is sufficiently severe or pervasive to satisfy the pleading standards for a Title VII hostile work environment claim based on sex.

**Issue 4.**  Whether the Court improperly granted summary judgment on Nixon's Breach of Contract claim where there were issues of material fact in dispute.

## STATEMENT OF THE CASE

Background

Kysela was the owner of KPF. (JA1203). In the summer of 2013, Kysela asked Nixon to dinner. (JA199, JA740-41). From there the two started a romantic relationship as they both were in the beginning phases of ending their respective marriages. (JA741-42). The relationship quickly expanded, and Kysela began involving Nixon with his company, KPF. Kysela first hired Nixon as an independent contractor. (JA622). By February 2015, Kysela extended Nixon an employment agreement; it was the first of many. (JA621-22, JA1703). In July 2016 Kysela ended Nixon's employment with KPF through a separation agreement that included provisions related to Nixon and Kysela's personal relationship. (JA1703). Nixon continued to be paid during September 2016 "[b]ecause [ Kysela] wanted to take care of her." (JA662). During this time, Nixon was not performing duties for KPF to earn the compensation, "she was – you know, she was [Kysela's] girlfriend. [Kysela] loved her and [Kysela] wanted to take care of her." (JA662). In October 2016, Kysela extended Nixon another employment agreement with KPF.  (JA1703).

In March 2017, the two considered living together, but that would only occur upon the terms that Kysela set forth. (JA1074). Two of the key terms were that Nixon must give Kysela financial control and be sexually submissive to him. (JA1110, JA1074). Three months later, in June 2017, Kysela ended Nixon's employment with

KPF through a separation agreement that, again, included provisions related to Nixon and Kysela's personal relationship. (JA1074). In August, Nixon indicated to Kysela that she did not like being a sex break at the office, telling him she was "tired of 5 minute office sex and need more passion. I'm not fulfilled when we have office sex all the time she was tired of only having sex at the office." (JA835).

Kysela is a multi-millionaire, with annual income between $2 and $5 million. (JA586-87). Nixon was not good with money. (JA749-50). The parties joined together to borrow $60,000 from BB&T bank, for Nixon's benefit, but Nixon was required to sign a five-year employment agreement in order to get the money. (JA681, JA1092). When Nixon got divorced, Kysela bought her house and then rented it back to her with an option to buy. (JA653-54, JA759-60, JA1112-16). By the time of the operative facts, Nixon was financially dependent on Kysela not only for her job but also due to the BB&T loan. She had lived in a house owned by Kysela who, as landlord, could always end the lease. (JA1076).

Actionable Facts

With the factual scenario between the parties from 2013 to 2018 largely as background, the fact pattern during 2019 is the basis of the causes of action. During her employment, Kysela at times singled Nixon out for criticism in front of other employees during sales staff meetings, which Nixon believed was a tactic to create fear that she would feel pressure to continue the sexual relationship in order to keep

her job. (JA86-87). Such actions placed severe strain on Ms. Nixon, causing her headaches and stress over potentially losing her job. Ms. Nixon was eventually diagnosed with Chronic Tension Headaches which required regular medication for over a year. This condition caused Ms. Nixon pain in the workplace and interfered with her ability to do her job as well as she otherwise could have performed. (JA87).

In January 2019, Nixon resigned from KPF. (JA836). Nixon and Kysela engaged romantically from time to time after the resignation but were not engaged romantically or in a personal relationship by the summer of 2019. (JA836). That summer Kysela was motivated to re-start both the sexual and employment relationships. (JA1069). In her prior tenure with KPF, Nixon had generally ranked towards of the bottom in sales performance in the company. (JA608-09, JA651-53, JA668-71, JA1129). Despite being one of the higher compensated salespersons, Nixon made her sales goal for only one month for her tenure with KPF. (JA608-09, JA651-53, JA668-71, JA1102, JA1126-27). Other managers viewed Nixon as "not qualified to be selling wine" and "not a wine salesperson." (JA1128-29). The Vice President of Sales thought Ms. Nixon was overpaid. (JA1125-27).

Nevertheless, in July 2019, Kysela asked Nixon to return to KPF. (JA1069). KPF and Nixon entered into an employment agreement, with a three-year term of employment providing termination only for (1) conduct evidencing substance abuse or dishonesty that affects its business interests, (2) failure to meet sales goals,

(3) Nixon's breach of contract terms, or (4) Kysela's dissatisfaction with job performance *if* the Company provided thirty day's written notice. (JA1098). Before agreeing to return, Nixon expressed to Kysela that she planned to move on with her life and relationships and, hoping Kysela would oblige, that she would not entertain seeing him in a personal level again. (JA963, JA1073-74). On the other hand, the sexual relationship and work relationship were "all one thing" to Kysela. (JA700-01, JA1069).

The parties' sexual relationship had ended and started at least twenty times during the prior six-year period. (JA834). Throughout, Kysela urged Nixon to stay at KPF or come back to KPF. (JA835). The summer of 2019 turned out to be no different. Nixon became reemployed and the two re-started a sexual relationship, which continued to early September 2019. (JA1075, JA722-23).

In early September 2019 the sexual relationship ended for the final time. Kysela testified that "we were tired of each other." (JA722-23). According to Kysela, they ended their sexual relationship prior to September 24, 2019. (JA722-23). During mid-September, Kysela was on a trip to Europe and Nixon was recovering from a medical procedure. (JA711, JA714). As Kysela was preparing to return from Europe, he wanted to see Nixon. Beginning on September 24, they exchanged messages about whether to see each other on the Sunday night (September 29) of Kysela's return. (JA713-24, JA1075, JA1103-06). Kysela said

he wanted to see Nixon to talk business. (JA452-53, JA718-22). Nixon recognized that Kysela's invitation for a Sunday night in-person meeting was an invitation to have sex. (JA452-53, JA718-22, JA1223). On September 25, 2019, in response to Kysela's September 24 message, Nixon declined and suggested a phone call or a meeting the next business day. (JA718-22, JA1075). She reiterated that the sexual relationship was done and that a meeting would be business only. (JA718-22, JA1075). Nixon further wrote that "I have nothing to vent to you, we've said all that needs to be said.  It's over and done." (JA460-61, JA1075).

Kysela understood Nixon was saying that she did not want to be involved personally anymore with him. (JA718-22, JA1075). Kysela questioned Nixon as to why she could not meet on Sunday, asking "Why are you so unavailable, Love?" and inquired if she was away for the weekend. (JA715-16, JA1075). When there was no concession, he then responded that she should "behave" and "relax" and that they would "be fine." (JA720-21, JA1075). When they finally spoke by phone on Sept. 29, Kysela understood the relationship was over and fired Nixon. (JA452-53, JA720-21, JA726-27, JA1075).

Procedural History

On February 15, 2021, Nixon filed her Complaint against KPF and Kysela arising out of her termination and the work environment leading up to it. (JA2). KPF and Kysela moved to dismiss Nixon's Complaint, and on March 22, 2021, she filed an Amended Complaint as of right. (JA2). KPF and Kysela again moved to dismiss parts of the Amended Complaint. (JA3). The District Court dismissed Nixon's Title VII hostile work environment claim with leave to amend. (JA66-81). After Nixon filed her Second Amended Complaint, KPF and Kysela again moved to dismiss parts of the Second Amended Complaint. (JA3). The District Court ultimately dismissed Nixon's Title VII hostile work environment claim and allowed to her gross negligence claim to proceed only as to Kysela. (JA151-59).

After discovery, on December 27, 2021, KPF and Kysela moved for summary judgment. (JA4). Upon consideration of the parties' briefs and oral argument, the District Court granted summary judgment in favor of KPF and Kysela. (JA1203-35). Nixon timely appealed the District Court's award of summary judgment as to her Title VII quid pro quo claim and breach of contract claim. (JA1236). Additionally, Nixon timely appealed the District Court's dismissal of her Title VII hostile work environment claim.  (JA1236).

## SUMMARY OF ARGUMENT

When asked "and was your desire to bring her back to the company in July of 2019 connected with your sexual relationship with her?" Kysela answered, "It was all one thing." No other comment, testimony, or document better describes this case. For Kysela, his relationship with Nixon included sex, her job working for him, and his various financial support of her. In his view, he would handle the money and she would be sexually submissive to him. The terms and conditions of Nixon's employment with KPF were intertwined and dependent on her sexual relationship with Kysela. When Nixon terminated the sexual relationship for good, Kysela terminated the employment relationship for good.

The District Court erred first in holding that no reasonable jury could find that Kysela had made unwelcomed sexual advances toward Nixon, the refusal of which resulted in her termination. In fact, there was evidence that Kysela made an unwelcome sexual advance in July-August 2019 when he brought Nixon back to the company and then resumed a sexual relationship with her. There was evidence that Kysela made an unwelcome sexual advance on September 24, 2019, after their sexual relationship had ended, when he asked Nixon to meet him on Sunday night for what could be assumed to be a sexual encounter. There was evidence that during the parties' exchanged messages of September 24-25, 2019, Kysela again made unwelcome sexual advances.

The District Court erred again when it reviewed case law in which courts found that employment terminations after the ending of sexual relationships were not "because of sex," because intervening factors were the actual cause of the termination of employment, and concluded effectively that no job termination after the termination of a sexual relationship could be "because of sex." In the instant case there were no such intervening factors. The Court of Appeals should take the opportunity to review the "because of sex" requirement in this context, apply plain meaning, and simplify the rule, removing the requirement to rely on distinct sexual advances and instead direct courts to review the facts holistically to determine whether a termination is "because of sex."

The District Court further erred in granting summary judgment on the breach of contract claim, because if the termination was "because of sex," then it did not meet any of the contractual criteria for termination.

Finally, the District Court erred in dismissing the hostile work environment claim. Nixon was subjected to constant pressure in the workplace to continue the parties' "consensual" sexual relationship, evidenced by a revolving-door history of the sexual relationship ending, the job being terminated, the sexual relationship resuming, and the job being restored. She was demeaned by Kysela at work as a reminder of his power over all aspects of her life, including a financial loan and ownership of her residence.

## STANDARD OF REVIEW

A district court's award of summary judgment is reviewed "*de novo*, applying the same standard applied by the district court." *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 149 (4th Cir. 2012) (citing *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011); *Med. Waste Assocs. Ltd. v. Mayor & City Council of Baltimore*, 966 F.2d 148, 150 (4th Cir. 1992)). Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (2013) (internal quotation marks omitted). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). The Court "view[s] the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party . . . ." *Id.* at 312. In doing so, the Court must not weigh evidence or make credibility determinations. *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). "[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam) (internal citations omitted).

When reviewing the grant of a motion to dismiss, an appellate court reviews the case *de novo. Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). As with the district court upon initial review, the Court must draw all reasonable inferences in favor of the appellants; however, the Court is not bound to "accept the legal conclusions drawn from the facts," nor to "accept as true unwarranted inferences, unreasonable conclusions or arguments." *Id*. A plaintiff must allege "a plausible claim for relief," instead of merely state facts that leave open "the *possibility* that a plaintiff might later establish some set of undisclosed facts to support recovery." *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 587 (4th Cir. 2015) (emphasis in original).

## ARGUMENT

I. **THE DISTRICT COURT ERRED IN FINDING NIXON COULD NOT HAVE BEEN TERMINATED "BECAUSE OF SEX" BY FAILING TO GIVE PROPER CONSIDERATION TO EVIDENCE OF SEXUAL ADVANCES AND BY APPLYING AN INCORRECT LEGAL STANDARD UNDER WHICH NO EMPLOYEE ENDING A SEXUAL RELATIONSHIP WITH A SUPERVISOR COULD RETAIN A CLAIM OF RETALIATORY DISCHARGE UNDER TITLE VII.**

The District Court erred in failing to recognize evidence that on at least three occasions Nixon refused Kysela's sexual advances, leading to her termination. The District Court not only endorsed but expanded a flawed legal concept that effectively determined that employers who terminate those who end consensual sexual relationships are not in violation of Title VII. Some cases have found that employers

in such cases terminate employees not "because of sex" but for intervening reasons, such as finding it personally difficult to engage in the workplace with a former sexual partner. The District Court seemed to expand the concept to all cases, without the need for an intervening factor. The District Court further made credibility terminations regarding contested facts in order to support its legal opinion.

Section 703(a) of Title VII forbids "an employer – (1) to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his . . . terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The United States Supreme Court recognized that that statutory language "terms" and "conditions" of employment created different types of sexual discrimination claims, the first one becoming known as *quid pro quo* discrimination. *See generally Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986). Later, the Court noted that in *Meritor*, "we assumed, and with adequate reason, that if an employer demanded sexual favors from an employee in return for a job benefit, discrimination with respect to terms or conditions of employment was explicit." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 752 (1998).

In other words, in a quid pro quo case, "[w]hen a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a

change in the terms and conditions of employment that is actionable under Title VII." *Id.*, 524 U.S. at 753-54. Quid pro quo sexual harassment "encompasses situations where submission to unwelcome sexual advances is not explicitly made a condition of employment, but the rejection of such advances is nevertheless the motivation underlying an employer's decision to take an adverse employment action against an employee." *Briggs v. Waters*, 484 F. Supp. 2d 466, 477 (E.D. Va. 2007) (internal citations omitted).

To make a prima facie case for quid pro quo harassment, "a plaintiff must establish: (1) the employee belongs to a protected group; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment; and (5) the employer knew or should have known of the harassment and took no effective remedial action." *Thomas v. Sw. Virginia Transit Mgmt. Co., Inc.*, No. 7:19-CV-00652, 2020 WL 3237977, at *5 (W.D. Va. June 15, 2020) (citing *EEOC v. Appalachian Power Co.*, Case No. 1:18CV00035, 2019 WL 4644549, at *6 (W.D. Va. Sept. 24, 2019) (citing *Okoli v. City of Balt.*, 648 F.3d 216, 222 (4th Cir. 2011)).

Supreme Court precedent establishes that an employee's refusal to submit to a supervisor's demand for sex results in a tangible employment action. *Ford v.*

14

*Simms*, 23 F. App'x 152, 154 (4th Cir. 2001) (unpublished) (citing *Ellerth*, 524 U.S. at 760). One district court has found that "sexual behavior directed at a woman raises the inference that the harassment is based on her sex." *Moberly v. Midcontinent Commc'n*, 711 F. Supp. 2d 1028, 1039 (D.S.D. 2010); *see also* 29 C.F.R. § 1604.11(a) ("Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment" in violation of Title VII on the basis of sex "when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment [or] (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual").

In *Moberly*, the supervisor "did not expressly threaten [the plaintiff] with adverse action if she did not respond favorably to his advances," but after the supervisor made advances towards the plaintiff, she was denied a bonus approximately three months later and terminated approximately four months later. *Moberly*, 711 F. Supp. 2d at 1039. The supervisor "indicated on the termination form that the reason for Moberly's termination was 'continuous and ongoing challenges [with] management.'" *Id.* at 1039-40. The district court held, taking in a light most favorable to the plaintiff, that "[t]his statement is sufficiently broad and vague that it could be found to include continuous and ongoing challenges in [the plaintiff's] personal interactions with [the supervisor], including her rejection of his advances"

and "sufficiently establishes that [the plaintiff's] submission to [the supervisor's] unwelcome advances was an implied condition for receiving job benefits or that her refusal to submit to his advances resulted in the denial of a bonus and the termination of her employment. *Id.* at 1040.

A.     <u>A Reasonable Jury Could Find that KPF Terminated Nixon Because She Rejected Kysela's Unwelcome Sexual Advances, in the Course of Ending the Sexual Relationship Between the Two, in Violation of Title VII.</u>

At the onset, the District Court's own generalization of this case presents the case as one that requires factual determinations by a jury. The District Court stated that "[t]here were a myriad reasons why Nixon and Kysela almost ended their business relationship, but the primary reason was undoubtedly the status of their sexual relationship." (JA1207, JA1227) ("While it is unnecessary—given Nixon's failure to make out a prima facie case of discrimination—to hold that these reasons are pretextual, the court is *extremely* skeptical that Nixon's firing was not based, at least in part, on the termination of her relationship with Kysela").

Nixon was terminated because she was not going to have a sexual relationship with Kysela. Thus, the District Court's opinion turned on whether Kysela made a sexual advance and whether it was unwelcome. "Advances are unwelcome if the plaintiff regarded them as undesirable or offensive and did not solicit or incite them." *Briggs v. Waters*, 484 F. Supp. 2d 466, 478 (E.D. Va. 2007). In determining whether there were any unwelcomed advances, the District Court improperly weighed

evidence and made credibility determinations. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986). In other words, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Id.* (citing *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 159-159, 90 S. Ct. 1598, 1608-1609 (1970)).

In this case, there were three unwelcome advances in Nixon's final period of employment with KPF from August 2019 through October 2019.

    1.    <u>There was an unwelcome sexual advance in August 2019</u>.

Kysela admitted that, regarding the job and sex, "[i]t was all one thing." (JA700-01). Prior to Nixon's last period of employment with KPF, which began in the summer of 2019, she expressed to Kysela that she planned to move on with her life and relationships and, hoping Kysela would oblige, that she would not entertain seeing him in a personal level again. (JA836, JA963, JA1073-74). But he rehired her and then prevailed on the personal front. Although Nixon made clear she did not want to be in a sexual relationship, the two ended up back in a sexual relationship after she returned to working for him. (JA836). The fact that Nixon gave in to Kysela's advance does not mean the advance was welcome, because at the outset

17

she had said she did not want a relationship when reengaging with employment. This puts Nixon's consent at issue. *See* 29 C.F.R. § 1604.11(b) (the EEOC makes determination as to the existence of sexual harassment on a case-by-case basis and "look[s] at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred").

The District Court rejected Nixon's argument. "The record undermines this revisionist history. When Nixon and Kysela began discussing Nixon's return to the Company, in July 2019, they were still in an 'on again, off again' personal and sexual relationship." (JA1222). But that's not clearly the case. In July 2019, Nixon said the sexual relationship was off. (JA459, JA963, JA1073-74) (Nixon wrote to Kysela, "I won't entertain seeing on a personal level ever again"). The District Court concluded that because Nixon ultimately gave in to sex the following month, none of the sexual advances to get there could be found by a jury to be unwanted. (*See* JA1222) ("Although the parties exchanged emails at the beginning of August expressing their mutual desire to keep their renewed working relationship strictly professional . . . , it is undisputed that their consensual sexual relationship, which had been ongoing for months prior, continued afterwards, just as it always had"). This line of thinking ignores the relevant analysis; it is not whether someone submits to the advance, it's whether the advance was unwelcome. Thus, it was the District Court which engaged

in revisionist history by looking to see what happened next and concluding that since the two got back together, that must mean that the advance that started the re-engagement was simply part of the on-again, off-again pattern. The Court rejected the possibility that the relationship was unwanted by Nixon but that Nixon was pressed to reengage as a means of keeping her job.

Two things are clear. First, at the time Kysela wanted to bring Nixon back to KPF, Nixon did not want a personal relationship and she actively took steps to make it known that she was not soliciting or inciting anything personal. Second, at the time Kysela wanted to bring Nixon back to KPF, he wanted both the employment relationship and sexual relationship to start again. (JA700-01, JA836, JA1069). Consequently, it was a question for the jury to determine whether the re-start of personal relationship was an unwelcome advance by Kysela. Accordingly, KPF is not entitled to summary judgment and the District Court's award of summary judgment must be reversed.

      2.    <u>There was an unwelcome sexual advance on September 24, 2019</u>.

Kysela made a sexual advance on September 24, 2019 when he asked to see Nixon on a Sunday night to "discuss business." Couples do not generally ask each other for sex by saying exactly, "let's have sex." Couples use other words or indicators. Maybe it's "let's go to bed early," or "there's nothing on TV tonight," or "please give me a backrub." Prior to September 24, 2019, Kysela and Nixon had

ended their sexual relationship. (JA722-23, JA1075). But on September 24, 2019 (a Tuesday), Kysela emailed Nixon requesting to see her on Sunday night the 29th after his return from Europe. (JA713-24, JA1075, JA1103-06).

On September 25, 2019, in response to the invitation, Nixon declined and suggested a phone call instead. She reiterated that the sexual relationship was over and that a meeting would be business only. (JA1075, JA1103-06). Nixon wrote that "I have nothing to vent to you, we've said all that needs to be said. It's over and done." (JA1075, 1103-06). But, Kysela wanted to meet in person. He asked "[w]hy are you so unavailable, Love?" and inquired if she was away for weekend. (JA1075). He then said that she should relax and that they would be fine. (JA1075, JA1223). Given their past history of making up and resuming sexual relations, a reasonable jury could infer from these texts that Kysela wanted to meet in person on a Sunday night, and not have a phone call or a business day meeting, because he wanted sex. Even the District Court agreed that was reasonable interpretation of the exchange. (*See* JA1223) ("this is a fair reading of the email given the nature and status of their relationship").

Therefore, a jury could certainly conclude that the sexual advance was unwelcome. There was evidence that Kysela and Nixon ended their sexual relationship prior to September 24, 2019. (JA722-23). Despite Kysela's belief that the sexual relationship was over, he sent his September 24, 2019, email anyway,

soliciting Nixon for sex. She rejected this advance by declining to meet on the weekend. She reiterated that it was over and stated that any meeting would be professional only. Based on these facts, a reasonable jury could find that Kysela's September 24, 2019, email was an unwelcome advance that was rejected by Nixon.

The District Court, however, made its own factual determination in favor of Kysela. The District Court stated that (1) "Nixon has adduced no **credible** evidence that Kysela made any unwanted sexual advances towards her during their overlapping personal and professional relationships" and (2) that the September 24 advance "cannot be deemed unwelcome because Kysela did not know that their relationship has ended." (JA1221, JA1224) (emphasis added). On the first point, the Court made a credibility determination. The second point is especially egregious. Kysela himself testified that the relationship had ended prior to September 24. (JA722).  The court determined that Kysela's "recollection [was] contradicted by Nixon's testimony and contemporaneous text messages." (JA1211). The court decided to believe Nixon and not Kysela on an evidentiary point where Kysela's own testimony hurt him. Furthermore, given that the District Court made the finding that the September 24 advance "cannot be deemed unwelcome because Kysela did not know that their relationship has ended," (JA1221, JA1224), it is certainly relevant that Kysela himself testified that the relationship had ended previously. The District Court had no business concluding that Kysela had erred in his recollection.

21

The District Court improperly weighed the evidence and made a credibility determination against the non-moving party. Only a jury can properly make that determination.

> 3.    The continued sexual advances in the September 24-25 exchange.

Within the September 24-25, 2019, email exchanges there were multiple advances. The District Court acknowledged

> that, even after Nixon expressed to Kysela that their relationship was 'over and done' during this e-mail exchange, Kysela made two other comments, but neither of these amounts to an "unwelcome sexual advance" for purposes of a Title VII quid pro quo claim. First, Kysela responded, 'You're the problem child. **Behave and we will be fine**.' [(JA11030]. Nixon replied, 'Stop being so mean. I don't have a problem with you at all. I just don't want to be involved personally. It's not a healthy situation.' (*Id.*) And Kysela wrote, "Teresa, You have many issues. I have tried to help you over the years. **Relax here**. **We will be fine**." (*Id.*) While Kysela's remarks express his belief that the relationship was still salvageable, they do not amount to "conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or unincited and is undesirable or offensive . . . ." *Rodriguez*, 250 F. Supp. 2d at 699.

(JA1223) (emphasis added).

While the comments themselves are not objectively sexual, they allow for a reasonable jury to find that Kysela was attempting to assert his dominance to persuade Nixon to have sex. It is undisputed that during their relationship "[i]n exchange for his financial support, Kysela insisted that Nixon abide by certain terms and conditions, including that Nixon be 'loyal' and 'submissive' sexually."

(JA1205). Kysela's language is telling. After an adult woman states she is "over and done," he responds by referring to her as a "child," and telling her to "behave" and "relax." This is the type of language used when speaking to someone from a place of complete authority. In other words, this is how you to speak to someone who is supposed to be submissive. The reasonable inference is that Kysela was reminding Nixon that his financial support (including her employment) came with her being sexually submissive, and that she needed to submit. This was a sexual advance. Nixon had clearly ended the relationship and Kysela was trying to revive it. She did not submit. He terminated her on September 29.

On this point Judge Cullen said it well, "I wholeheartedly agree with [Nixon]. In a light most favorable to [her], [Kysela] wanted to get together that Sunday for sexual reasons . . . . I don't know that that was unwanted." (JA1182). There is a dispute on whether it was "unwanted." Thus, there is question of fact as to whether the September 24-25, 2019, exchange involved an unwelcome advance. Accordingly, KPF is not entitled to summary judgment and the District Court's award of summary judgment must be reversed.

B.   The District Court Applied an Unworkable and Incorrect Standard in Determining Whether Nixon's Termination was "Because of Sex" Under Title VII.

While the District Court acknowledged that it "[didn't] know" whether Kysela's final sexual advance was "unwanted," it then applied a new, incorrect, and unworkable standard, resulting in an analysis under which no termination of employment following the end of a sexual relationship could qualify as a retaliatory termination under Title VII. The Court of Appeals must reject the District Court's legal analysis and clarify the terms under which a post-sexual relationship employment termination may be "because of sex" under Title VII.

Ultimately, Nixon's termination occurred within days after Nixon rejected Kysela's September 24, 2019, unwanted advance. (*See* JA1073, JA1075-76). This Court has long recognized that temporal proximity is strongly suggestive of "motive, and gives rise to a sufficient inference of causation to satisfy the *prima facie* requirement." *See Coursey v. Univ. of Maryland E. Shore*, 577 F. App'x 167, 175 (4th Cir. 2014) (internal quotation marks omitted) (Title VII retaliation case) (citing *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994); *King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003)). The facts here set forth an on-again off-again sexual relationship that was at all times connected and tied to employment status, including multiple terminations of both the sexual relationship and the employment. (*See* JA833-84, JA837-38, JA1073, JA1075-76). Consequently, when Nixon made it

clear the sexual relationship was over and would not resume, she was terminated permanently and almost immediately. (*See* JA1074-75). Importantly, there were no intervening factors between September 24 and September 29, and the history of the parties (an on-again, off-again sexual relationship running aside an on-again, off-again employment relationship) supports the inference that Nixon's refusal to resume having sex with Kysela was the reason for her termination. (*See* JA1073, JA1075-76, JA1207) ("[t]here were a myriad reasons why Nixon and Kysela almost ended their business relationship, but the primary reason was undoubtedly the status of their sexual relationship").

The existence of unwelcome sexual advances is sufficient to create a question of fact as to whether the adverse action was "because of sex." *See Fredette v. BVP Mgmt. Assocs.*, 112 F.3d 1503, 1505 (11th Cir. 1997) ("In the paradigm harassment case, where a heterosexual male makes unwelcome advances toward a female, we have readily concluded that the harassment occurred 'because of sex'") (citing *Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982)); *Newton v. Cadwell Labs.*, 156 F.3d 880, 883 (8th Cir.1998) (holding, without mentioning special rule for causation, that employee who terminated consensual affair with supervisor may have a claim for hostile work environment sexual harassment based on supervisor's post-breakup conduct); *see* 29 C.F.R. § 1604.11(a) ("Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature

constitute sexual harassment" in violation of Title VII on the basis of sex "when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment [or] (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual"). Therefore, to the extent that a jury finds there was unwelcome advance, then there is sufficient evidence for a jury to find that the termination was because of sex.[1]

While District Court "fully recognize[d] that someone in a consensual romantic relationship could still be subjected to unwanted sexual advances by her (or his) partner during that relationship," the court, nonetheless, held that **"[e]ven if Nixon could establish that Kysela subjected her to unwelcome advances after ending their consensual relationship**, she cannot establish the third element–that any purported harassment or the resulting employment consequences were 'based on sex' for purposes of a Title VII quid pro quo harassment claim." (JA1221, JA1225) (emphasis added). Here, the Court proceeded down a rabbit hole, following outdated cases that rejected quid pro quo claims following the cessation of a consensual sexual relationship.

---

[1] The District Court acknowledged that "… the court is extremely skeptical that Nixon's firing was not based, at least in part, on the termination of her relationship with Kysela." (JA1227).

One district court has opined that "negative employment actions which follow on the heels of a consensual relationship gone sour do not constitute quid pro quo sexual harassment *unless they are linked in some way to other or further 'unwanted' sexual advances*." *West v. MCI Worldcom, Inc*., 205 F. Supp. 2d 531, 545 (E.D. Va. 2002) (emphasis added). In *West*, the consensual relationship at issue ended in early July of 1999, the plaintiff-employee began another relationship, and she was subsequently removed from her assignment in September. Jealously over the new relationship by her supervisor was a cause of her termination. 205 F. Supp. 2d at 545. The district court found that the plaintiff-employee failed to show that the-ex love interest, Quale, made unwanted advances and, thus, failed to show that the "campaign to remove her . . . was 'because of sex.'" *Id.* Specifically, the district court stated "[i]n light of the absence of any evidence of unwanted sexual advances, the record arguably supports Plaintiff's theory that Quale's alleged actions were because of his animosity toward West for ending the consensual relationship rather than her gender." *Id.*

Other cases have followed this framework.

*Tenge v. Phillips Modern Ag. Co.*, 446 F.3d 903 (8th Cir. 2006) involved a plaintiff-employee who engaged in writing "sexually suggestive notes to [her supervisor]" and the two engaged in "consensual touching." *Id.* at 910. The reason offered by the employer-defendant for the employee-plaintiff's termination was

found to be because of "the consequences of her own admitted conduct with her employer, not because of her status as a woman." *Id.*

Similarly, in *Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197 (11th Cir. 2001), the plaintiff-employee had a relationship with male who held a supervisory position within her department. *Id.* at 1200–01. He was not, however, the plaintiff-employee's direct supervisor. *Id.* The court found the motivations by her direct supervisor were not connected to the relationship between the plaintiff-employee and her superior. *See id.*

In all of these cases, the courts determined that there were no unwelcome advances during the interim period between the ending of the relationship and the termination. Then upon this finding, and only this finding, the courts in these cases held that the plaintiff-employee failed to sufficiently allege or put forth evidence that the adverse employment action was "because of sex." Instead, intervening events (between the end of the sexual relationship and the termination of employment) were found to have caused the termination. As such, these courts determined that the failure to show an unwelcome advance resulted in an inability to show that the employer's motivation was "because of sex."

In the instant case, the District Court ultimately leaned on these cases for the overly broad proposition "that in the context of failed consensual relationships ('break-ups'), the motivating animus is personal in nature and stems from the

defendant's bruised feelings rather than the plaintiff's sex." (JA1225). In so finding, the District Court misapplied these cases. These cases never stood for the proposition that a termination of employment that follows the termination of a sexual relationship cannot be "because of sex." These cases simply found, under their specific facts, that other things that occurred *after* the end of the sexual relationship caused the employment termination. However, there is no evidence in the instance case, unlike the cited cases, that Kysela's bruised feelings, his own emotional heartburn at seeing Nixon with other men (which never happened), or some interaction subsequent to the end of the personal relationship was the reason for ending employment. The District Court expanded the limited factual findings in the cited cases into a general rule to be applied in all cases.[2] The Court posited that **"[e]ven if Nixon could establish that Kysela subjected her to unwelcome advances after ending their consensual relationship**, she cannot establish the third element–that any purported harassment or the resulting employment consequences were 'based on sex' for purposes of a Title VII quid pro quo harassment claim." (JA1224-25). The problem is that she can, and she did. She was terminated for stating she would not have sex with Kysela.

---

[2] While the District Court cited *Ford v. Simms*, 23 F. App'x 152 (4th Cir. 2001) (unpublished), *Ford* merely demonstrates that a former consensual relationship can still form the basis for a Title VII quid pro claim. *Ford*, 23 F. App'x at 153.

The District Court's decision illustrates the rabbit hole of this line of cases. Beginning with a causation finding – that emotional reactions after the relationship ended caused a termination – the court ended up with language suggesting that a termination the follows the end of a consensual relationship can *never* be "because of sex." The Court of Appeals need not reject *West* outright because the District Court expanded its finding. At least in *West* the holding was based on evidence of an arguably non-sex-based reason for firing (discomfort at having his former girlfriend in the workplace dating other men), whereas, here, the District Court required no intervening explanation for the termination. It is this expansion of *West* that must be pulled back. Any termination that follows the termination of a sexual relationship is permitted by the District Court's rule, because there is no remedy to challenge it.  The logical follow-on is that supervisors will be able to continue their sexual relationships with subordinates, even if the subordinate wishes to end the relationship, by threatening termination of employment in order to keep the sexual relationship going. In essence, the District Court opinion gives supervisors *carte blanche* authority to retaliate by terminating any subordinate ending a sexual relationship with them. To find such a scenario is not "because of sex" makes a mockery of the basic protections Title VII sought to establish.

C.   The Court Should Adopt a Clearer and Simpler Definition of "Because of Sex" Based on the Plain Meaning of the Statute, Under Which Nixon's Termination, Admittedly "Because of" the Ending of a Sexual Relationship, was "Because of Sex."

The Court of Appeals should correct the District Court's detour and establish an improved path for reviewing "because of sex" cases. A simpler reading of the phrase "because of sex" would ensure parties do not head down the same path as the District Court. The Supreme Court has spoken in favor of simplicity in a Title VII context. In *Bostock v. Clayton Cnty., Georgia*, the Supreme Court held that terminations due to an employee being gay or transgender were "because of sex" and violated Title VII. 140 S. Ct. 1731 (2020). The Court said, "when the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law …" *Id.* at 1737. Explaining further, the court stated, "only the words on the page constitute the law adopted by Congress and approved by the President." *Id.* at 1738. The Court then explained that "sex" is defined not just as "reproductive biology," but includes a broader scope. "Because of sex" must mean "by reason of" or "on account of." *Id.* at 1739, *citing University of Tex. Southwestern Medical Center v. Nassar*, 570 U.S. 338, 350, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013). "That form of causation is established whenever a particular outcome would not have happened "but for" the purported cause." *Id.* Proceeding further, "so long as the Plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law." *Id.* For example, "firing [woman]

for actions or attributes it would tolerate in an [man]." *Id.* "It doesn't matter if other factors besides the plaintiff's sex contributed to the decision," if an employer "intentionally fires an individual employee based in part on sex," then it violates Title VII. *Id*. at 1741 (setting forth the example of when an employee refuses sexual advances).

There can be little doubt that the plaintiff's sex is one but-for cause of a decision to terminate employment, when the decision to terminate is based on the ending of a sexual relationship. Kysela and Nixon were in a sexual relationship "because of sex." When it ended, the employment ended, also "because of sex." The courts need not, and should not, complicate the clear simplicity of the statute's language. *West*, *Tengue*, and *Pipkin* were not about defining "because of sex," they were about causation. As such, they are at best a side street to the central principle. That principle, defining "because of sex," should be grounded in the plain meaning of the terms of the statute. This Court should clarify and hold that a termination of employment "because of" the ending of a sexual relationship is, or at least can be, a termination "because of sex." In the instant case, Nixon was terminated because of the fact she refused to have sex. As such, the termination was "because of sex."

Such a holding would be consistent with evolving understandings of sexual harassment and its connection to one exerting dominance in a power relationship, which can often arise in the workplace. Sexual harassment is not always about sexual

desire. It is "often a manifestation of power." *The Implications of Admitting Evidence of a Sexual Harassment Plaintiff's Speech*, 41 UCLALR 117, 135 (1993), *citing* Bravo & Cassedy, *The 9 to 5 Guide to Combating Sexual Harassment* 4, 17 (1992); MacKinnon, *Sexual Harassment of Working Women* 208, 217-21 (1979); *Blue-Collar Blues: The Sexual Harassment of Women Autoworkers*, 9 Work & Occupations 271, 273 (1982). As such, the Third Circuit has noted that "the degree of control and specific power dynamic can offer context to the plaintiff's subjectively held fear of speaking up, for instance, if the supervisor 'took advantage of the power vested in them … to facilitate their abuse' or harassment. *Minarsky v. Susquehanna County*, 895 F.3d 303, 314 (2018) (*quoting Vance v. Ball State Univ.*, 570 U.S. 421, 458 (2013) (further internal quotations omitted)).

In the instant case, the large volume of preliminary material in this case (essentially most evidence pre-dating Nixon's rehiring in July-August 2019) lays the foundation for the factfinder to understand the parties' actions and dynamics in light of the power relationships between the two. Kysela owned the company and Nixon was a salesperson. Kysela was a multi-millionaire, with annual income between $2 and $5 million. (JA586-87). Nixon was not good with money. (JA749-50). The parties joined together to borrow $60,000 from BB&T bank, for Nixon's benefit, but Nixon was required to sign a five-year employment agreement in order to get the money. (JA681, JA1092). When Nixon got divorced, Kysela bought her house and

then rented it back to her with an option to buy. (JA653-54, JA759-60, JA1112). By the time of the operative facts, Nixon was financially dependent on Kysela not only for her job but also due to the BB&T loan. She had lived in a house owned by Kysela who, as landlord, could always end the lease. (JA1076). And on top of it all, Kysela was male and Nixon was female. With that biological reality and the societal expectations, biases, and role-playing surrounding it, Kysela certainly was acting "because of sex" in all the complexities of this relationship.

In this case, the exertion of power is not theoretical. Kysela demonstrated it by changing Nixon's employment status in conjunction with changes in their sexual relationship. (*See* JA947-55, JA965-72, JA995-96, JA1006-31) (During the course of Ms. Nixon's and Mr. Kysela's relationship there were at least two employment separation agreements and four employment agreements).[3] As such, throughout the relationship, a disruption in the sexual relationship would not only put her job at risk, but also her greater financial security, and her housing. Kysela controlled every aspect of Nixon's life. He used that control to get the sex he wanted. In fact, when the parties were discussing living together, he demanded not only control over their

---

[3] The July 11, 2016, Separation Agreement also contained provisions related to the personal relationship between Nixon and Kysela. (JA1006-10, JA1019-23).

joint finances, but required Nixon to "submit sexually" to him. (JA1074, JA1110-11).[4]

Under these circumstances, the failure to submit sexually, regardless of whether there was specific unwelcome advance or not, resulted in her Nixon's termination. Thus, in an on-again, off-again relationship, the relevant analysis should not be whether a discrete statement or event was a "sexual advance." Instead, courts should determine whether employment actions were "because of sex," which could mean because of a singular sexual advance or because of other facets of a sexual relationship. Courts must also reject the implication that no sexual advance that is made during the course of a sexual relationship can be found to be unwelcome. (*See* JA1210) ("But a plaintiff can establish that the advances were unwelcome by showing that they occurred [or continued] *following the termination of the consensual relationship*") (emphasis added); (*See* JA1171) (In determining there was a sexual advance, the District Court stated, "[b]ut let's assume the Court construes that the, essentially, 'I'd like to see you Sunday night,' then the follow up,

---

[4] "First and foremost they cited the way in which its property roots have led to an erasure of female sexuality with the effect of perpetuating unequal power relations wherein the woman 'gives' consent and the man 'takes' it. This asymmetry is not accounted for in our current legal environment but constitutes almost every sexual interaction." Sexual Gender Policy 2021, *What to do about #MeToo? Consent, autonomy, and restorative justice: A case study*, Tina Sikka, PhD. https://onlinelibrary.wiley.com/doi/epdf/10.1002/sgp2.12027.

'Why are you so unavailable, love?' is a sexual advance. Because I think the fair reading of that is these two are in a relationship").

The Court should not allow the "unwelcome" element to be the keystone of a quid pro quo claim because it circumvents the intent of Title VII. Rebuffing an advance does not necessarily make the advance unwelcome. Nor does accepting an advance make it welcome. Whether an advance is "welcome" is determined at the beginning of the communication while whether it is accepted is the result at the end. Further, if the "welcomeness" of the advance becomes the focus, then when someone rebuffs a not unwelcome advance they can be terminated for their refusal. Similarly, if the employee "gives in" to the advance and it is incorrectly assumed to be "welcome," maybe they cannot. Title VII must protect against unwelcomed advances. It must also protect against retaliation for rejecting welcomed advances. Title VII must simply protect against adverse employment actions *because of sex*. *See Bostock*, 140 S. Ct. at 1740.

A rule that requires proof of a discrete unwelcome advance, combined with the false assumption that all advances are welcomed during a relationship,[5] as opposed to proof that sex was condition of employment, perpetuates the ability of a supervisor to make a sexual relationship a condition of employment under the guise of a consensual relationship. While "[t]he court fully recognize[d] that someone in a consensual romantic relationship could still be subjected to unwanted sexual advances by her (or his) partner during that relationship" (JA1221), its analysis, ultimately, requires two unwelcome advances; an outright refusal of one unwelcome advance (so the person making the advance now knows it's unwelcome) and then a subsequent unwelcome advance that is known to be unwelcome by the person making it. Such a construct takes away from an employee the ability to end the sexual relationship. In short, an employee in a consensual relationship with her boss forfeits her future Title VII protections. Her job can become a means of persuasion to have sex, in direct contravention of the intent of Title VII.

---

[5] The District Court conflated the issues of consent and welcomeness.  For example, the District Court stated, "[i]t's *consensual up until the point she says no*, I don't want to see you on Sunday night. So until that point there's nothing in the record that would indicate that anything he did was unwelcome." (*See* JA1185) (emphasis added). It also stated that the person making the advance needed to know it was unwelcome, thus adding an additional requirement to the rule. (JA1223) ("Until that point, Nixon had given Kysela no indication—through verbal or electronic communication, her conduct, or otherwise—that further romantic entreaties would be unwelcome").

## II. THE TRIAL COURT IMPROPERLY GRANTED SUMMARY JUDGMENT ON NIXON'S BREACH OF CONTRACT CLAIM BECAUSE THERE ARE QUESTIONS OF FACT AS TO WHETHER NIXON'S TERMINATION BREACHED THE EMPLOYMENT AGREEMENT.

In effect, the District Court granted summary judgment on Nixon's breach of contract claim because it improperly determined there was no Title VII violation. To the extent that there is a question of fact as to the Title VII claims there is also a question of fact as to the breach of contract claim. This is because the question under the breach of contract claim is whether KPF terminated Nixon because of job performance, under Section 7(d) of the contract, or because Nixon stopped having sex with Kysela (which was not a permitted justification for termination under the contract). (JA1093). When acts authorized by a contract are lawful, it is presumed that those acts will be performed in a lawful manner. *See MacCoy v. Colony House Builders, Inc.*, 239 Va. 64, 70, 387 S.E.2d 760, 763 (1990) ("[t]he contract . . . was to do an act in itself lawful, and it is to be presumed in a lawful manner") (quoting *Emmerson v. Fay*, 94 Va. 60, 26 S.E. 386, 388 (1896)). Thus, if a reasonable jury finds that Nixon was terminated in violation of Title VII, then KPF violated the employment agreement because her termination was unlawful and not authorized under the employment agreement. A finding that Nixon was terminated as an act of sex discrimination would also necessarily amount to a rejection of KPF's assertion that she was fired for performance reasons. Accordingly, the breach of contract claim

38

requires the same determinations of fact necessary for resolution of the Title VII claims and those resolutions must be made by the factfinder.  KPF is not entitled to summary judgment and the District Court's award of summary judgment must be reversed.

### III.    THE DISTRICT COURT ERRED IN RULING THAT ALLEGATIONS OF KYSELA'S REPEATED INVITATIONS FOR SEX, AND THE IMPLICIT THREAT OF EMPLOYMENT TERMINATION IF THE REQUESTS WERE REFUSED, COULD NOT CONSITUTE A VIABLE CLAIM OF SEVERE OR PERVASIVE HOSTILE WORK ENVIRONMENT BASED ON SEX IN VIOLATION OF TITLE VII.

The Second Amended Complaint sets forth a viable hostile environment claim which should have survived a Rule 12(b)(6) motion to dismiss. The on-again, off-again nature of the sexual and employment relationships between Nixon and Kysela make clear that Nixon knew that sex was a mandatory condition of her job. This toxic relationship required Nixon to consider the economic consequences of her decisions about sex. Looked at from the other direction, sex became an employment condition.

The toxic relationship between the two parties created a work environment where hostility was both severe and pervasive on account of sex. Kysela hired Nixon in 2014 during their sexual relationship.  (JA84).  He fired her when they ended their sexual relationship in May 2016.  (JA84).  He rehired Nixon in September 2016. (JA85). He terminated her in May 2017. (JA85). That termination was "not finalized" because the sexual relationship resumed. (JA85). In June 2018, Kysela

downgraded Nixon's job responsibilities. (JA86). On July 3, 2018, Kysela showed up at her house, "climbed a ladder and entered through an open door while Nixon was in the shower and convinced her to have sex with him." (JA86). In November 2018 Kysela sent Nixon an email, as part of a string of emails related to sex, where he said, "If you take care of me, I take care of you … that's how life works … you deny me and we have issues …" (JA85). In January 2019 Nixon left the company, only to later return. (JA85). Nixon ended the sexual relationship and almost immediately Kysela fired her.  (JA86-7).

These allegations describe a work environment that is both severe and pervasive. In addition to the pressure to have sex, the Second Amended Complaint further alleged that "Ms. Nixon became extremely nervous about the status of her employment. Her daughter was in college, and this caused Nixon financial strain. Nixon feared losing her job due to her financial situation." (JA86). In addition, "Ms. Nixon came to believe that her ability to keep her job was based on the continuation of her sexual relationship with Mr. Kysela. She was terrified if she ended the sexual relationship she would be fired, so she felt pressured to continue to have sex with Mr. Kysela, which she may not have done but for her concern of losing her job." (JA86).

On top of that foundation, the Second Amended Complaint provided further context to the circumstances surrounding Kysela's conduct, the extent of the

conduct, as well its connection to and impact on Nixon's work environment. Those

allegations were as follows:

- Mr. Kysela at times singled Ms. Nixon out for criticism in front of other employees during sales staff meetings. For example, he would criticize Ms. Nixon for texting on her phone, even though others were texting and were not criticized. Ms. Nixon believed this was an effort by Mr. Kysela to create fear in Ms. Nixon's mind, such that she would feel pressure to continue the sexual relationship in order to keep her job. (JA86).

- On other occasions Mr. Kysela did not make a sales folder for Ms. Nixon for a planned sales meeting, even though others in the meeting were given a folder. This was a way of embarrassing Ms. Nixon if Mr. Kysela was angry with her. (JA86).

- Mr. Kysela manufactured contrived criticisms of Ms. Nixon's job performance. For example, he took accounts away from her which made her unable to meet the annual sales bonus structure. He then claimed she failed to meet quota. In so doing, Mr. Kysela created false "problems" with her performance so he could then "reward" her if she continued to have sex with him. These actions placed additional pressure on Ms. Nixon as the implication was that she had to have sex with Mr. Kysela to keep her job due to his contrived criticisms. (JA86).

- On another occasion, Ms. Nixon was sexually harassed and sent an explicit photo by an employee. Mr. Kysela forced Ms. Nixon to sign a document saying she did not want to pursue a civil action. The person harassing her was a good friend of Mr. Kysela's son. (JA87).

- Such actions placed severe strain on Ms. Nixon, causing her headaches and stress over potentially losing her job. Ms. Nixon was eventually diagnosed with Chronic Tension Headaches which required regular medication for over a year. This condition caused Ms. Nixon pain in the workplace and interfered with her ability to do her job as well as she otherwise could have performed. (JA87).

While Nixon wanted separation between her sexual relationship with Kysela and her employment, there was nothing separating the two. These allegations were that Kysela's actions created a toxic relationship based on sex that permeated Nixon's life, including her work environment where Kysela used his authority to embarrass, inflict stress, and manipulate Nixon. This conduct was pervasive as it affected Nixon on a daily basis at work.

Furthermore, these actions left Nixon under a constant lingering fear of losing her job, while she was at work and when she was not. *See Ellerth*, 524 U.S. at 754 ("a threat before it is fulfilled is categorized as a hostile work environment") (citing *Oncale v. Sundowner Offshore Services, Inc*., 523 U.S. 75, 81 (1998)); *see also Howerton v. Bd. of Educ. of Prince George's Cty.*, No. CIV.A. TDC-14-0242, 2015 WL 4994536, at *19 (D. Md. Aug. 19, 2015) ("Notably, certain threatening statements, particularly statements that could be construed as threats of termination like 'end up gone,' can be deemed to be materially adverse employment actions") (citing *Moron v. Va. Polytechnic Inst. & State Univ.*, 508 F. App'x 226, 230–31 (4th Cir. 2013) (threats to terminate employment, including threat to that the plaintiff

needed to "become invisible" to keep her job, were sufficient to constitute an adverse employment action)). The result was a working environment filled with severe and pervasive hostile conduct based on sex.

Accordingly, the allegations were sufficient to state a claim for hostile work environment under Title VII and the District Court's dismissal of the claim must be overruled.

## CONCLUSION

This Court should reverse (1) the District Court's order granting summary judgment in favor of Appellee-Defendants Francis J. Kysela and Kysela Pere et Fils and (2) the District Court's order dismissing Appellant, Teresa Nixon's, Title VII hostile work environment claim, and remand for trial.

Respectfully submitted,

/s/ John C. Cook
John C. Cook
Philip C. Krone
COOK CRAIG & FRANCUZENKO, PLLC
3050 Chain Bridge Road, Suite 200
Fairfax, Virginia 22030
(703) 865-7480
jcook@cookcraig.com

*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*10,251*] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.    This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>September 6, 2022</u>          <u>/s/ John C. Cook</u>
                                                    *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 6th day of September, 2022, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Sarah W. Conkright
Thomas L. McCally
CARR MALONEY, PC
2000 Pennsylvania Avenue, Suite 8001
Washington, DC 20006
(202) 310-5565

*Counsel for Appellees*

/s/ John C. Cook
*Counsel for Appellant*