RECORD NO. 22-1406

In The

# United States Court of Appeals
### For The Fourth Circuit

## TERESA D. NIXON,

*Plaintiff – Appellant,*

**v.**

## KYSELA PERE ET FILS, LTD.;
## FRANCIS J. KYSELA, V,

*Defendants – Appellees.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF VIRGINIA
### AT HARRISONBURG

─────────────

### BRIEF OF APPELLEES

─────────────

**Thomas L. McCally**
**Sarah W. Conkright**
CARR MALONEY PC
**2000 Pennsylvania Avenue, NW, Suite 8001**
**Washington, DC 20006**
**(202) 310-5500**

*Counsel for Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __22-1406__    Caption: __Teresa D. Nixon v. Kysela Pere et Fils, Ltd & Francis J. Kysela, V__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Francis J. Kysela, V__
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:


5.  Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:


6.  Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.


7.  Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.


Signature: /s/ Sarah W. Conkright          Date:     April 27, 2022

Counsel for: Francis J. Kysela, V

- 2 -

[Print to PDF for Filing]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _22-1406_    Caption: _Teresa D. Nixon v. Kysela Pere et Fils & Francis J. Kysela, V_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Kysela Pere et Fils, Ltd._
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
       If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Sarah W. Conkright        Date:    April 27, 2022

Counsel for: Appellee Kysela Pere et Fils, Ltd.

Print to PDF for Filing

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................iv

PRELIMINARY STATEMENT ........................................................1

STATEMENT OF THE ISSUES........................................................3

STATEMENT OF THE CASE...........................................................4

    I.    Factual Background............................................................4

        A.    Facts Alleged in Second Amended Complaint...........................4

        B.    Undisputed Material Facts ...............................................5

            Nixon and Kysela's Relationship .................................5

            Nixon's Employment at KPF.......................................8

    II.    Procedural Background ......................................................10

SUMMARY OF ARGUMENT ..........................................................12

ARGUMENT ................................................................................14

    I.    THE DISTRICT COURT PROPERLY DISMISSED NIXON'S
        HOSTILE WORK ENVIRONMENT CAUSE OF ACTION
        UNDER FED. R. CIV. P. 12(b)(6) BECAUSE NIXON DID
        NOT ALLEGE THE REQUISITE SEVERE OR PERVASIVE
        CONDUCT NECESSARY TO PLEAD A CLAIM FOR
        RELIEF..................................................................14

        A.    Standard of review under Rule 12(b)(6)...................................14

        B.    The district court correctly dismissed Nixon's claim for
            hostile work environment ..........................................15

i

C.    Nixon failed to allege unwelcome conduct that was
sufficiently severe or pervasive ...................................................17

D.    The district court properly rejected Nixon's argument that
an unhealthy consensual relationship amounts to a hostile
work environment ......................................................................19

II.    THE DISTRICT COURT PROPERLY GRANTED
SUMMARY JUDGMENT DISMISSING APPELLANT'S
QUID PRO QUO SEXUAL HARASSMENT CLAIM ....................20

A.    Standard of review pursuant to Fed. R. Civ. P. 56 ..................21

B.    Quid pro quo sexual harassment in the context of
consensual workplace relationships requires an
unwelcome sexual advance *after* termination of the
relationship ...............................................................................22

1.    Nixon and Kysela were in a consensual romantic
relationship and no unwelcome sexual advances
occurred after their relationship ended ...........................24

2.    No unwanted sexual advances occurred in the final
period of Nixon's employment .......................................28

i.    No unwelcome advance occurred in August
2019 .....................................................................28

ii.    No unwelcome advance occurred in
September 2019 ....................................................30

C.    The District Court Correctly Held that the Undisputed
Facts Did Not Support a Finding that Nixon was
Terminated "Because of Sex." ..................................................34

III.    THE COURT SHOULD NOT OVERTURN EXISTING
PRECEDENT ......................................................................................37

IV.    THE COURT PROPERLY GRANTED SUMMARY
       JUDGMENT ON NIXON'S BREACH OF CONTRACT
       CLAIM BECAUSE SHE WAS TERMINATED IN
       ACCORDANCE WITH HER EMPLOYMENT AGREEMENT ......38

CONCLUSION ....................................................................................40

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. G.D.C., Inc.*,
    281 F.3d 452 (4th Cir. 2002) .........................................................................18

*Anderson v. Liberty Lobby*, *Inc.*,
    477 U.S. 242 (1986)................................................................................21

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................15

*Atkins v. Smyth Cnty. Virginia Sch. Bd.*, *No. 1:18CV00048*,
    2022 WL 584080 (W.D. Va. Feb. 25, 2022), *aff'd*,
    No. 22-1344, 2022 WL 9886714 (4th Cir. Oct. 17, 2022)...........................17

*Baqir v. Principi*,
    434 F.3d 733 (4th Cir. 2006) .........................................................................18

*Bass v. E.I. DuPont de Nemours & Co.*,
    324 F.3d 761 (4th Cir. 2003) .........................................................................18

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)...............................................................................15

*Briggs v. Waters*,
    484 F. Supp. 2d 466 (E.D. Va. 2007) ..........................................................22

*Campbell v. Masten*,
    955 F. Supp. 526 (D. Md. 1997)....................................................22, 23, 36

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)................................................................................21

*Conklin v. Suffolk*,
    859 F. Supp. 2d 415 (E.D.N.Y. 2012).........................................................23

*Desouza v. Off. of Child. & Fam. Servs.*,
    No. 18CV2463PKCSMG,
    2019 WL 2477796 (E.D.N.Y. June 12, 2019) ..............................................20

*Edwards v. City of Goldsboro*,
    178 F.3d 231 (4th Cir. 1999) ...........................................................................15

*E.E.O.C. v. Sunbelt Rentals, Inc.*,
    521 F.3d 306 (4th Cir. 2008) ...........................................................................18

*Faragher v. City of Boca Raton*,
    524 U.S. 775 (1998)..........................................................................................18

*Glover v. Oppleman*,
    178 F. Supp. 2d 622 (W.D. Va. 2001)..............................................................29

*Glynn v. EDO Corp.*,
    710 F.3d 209 (4th Cir. 2013) ...........................................................................21

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993)............................................................................................17

*Holtz v. Marcus Theatres Corp.*,
    31 F. Supp. 2d 1139 (E.D. Wis. 1999) .............................................................36

*Jennings v. Univ. of N.C.*,
    482 F.3d 686 (4th Cir. 2007) ...........................................................................18

*Keppler v. Hinsdale Tp. High Sch. Dist. 86*,
    715 F. Supp. 862 (N.D. Ill. 1989)..............................................................23, 35

*Meritor Savings Bank, FSB v. Vinson*,
    477 U.S. 57 (1986)............................................................................................37

*Moser v. MCC Outdoor, L.L.C.*,
    256 F. App'x 634 (4th Cir. 2007).....................................................................22

*Mustafa v. Iancu*,
    313 F. Supp. 3d 684 (E.D. Va. 2018) ..............................................................19

*Novak v. Waterfront Comm. of New York Harbor*,
    928 F. Supp. 2d 723 (S.D.N.Y. 2013) ............................................................23

*Okoli v. City of Balt.*,
    648 F.3d 216 (4th Cir. 2011) ...................................................................16, 22

*Oncale v. Sundowner Offshore Servs., Inc.*,
    523 U.S. 75 (1998)....................................................................................17, 36

*Pipkins v. City of Temple Terrace, Florida*,
    267 F.3d 1197 (11th Cir. 2001) ...................................................................36

*Scusa v. Nestle U.S.A. Co.*,
    181 F.3d 958 (8th Cir. 1999) .......................................................................31

*Stepheny v. Brooklyn Hebrew Sch. for Special Children*,
    356 F. Supp. 2d 248 (E.D.N.Y. 2005) ........................................................23

*U.S. EEOC v. Appalachian Power Co.*,
    No. 1:18CV00035,
    2019 WL 4644549 (W.D. Va. 2019)............................................................22

*Walker v. Mod-U-Kraf Homes, LLC*,
    775 F.3d 202 (4th Cir. 2014) ............................................... 15-16, 17

*West v. MCI Worldcom, Inc.*,
    205 F. Supp. 2d 531 (E.D. Va. 2002)......................................*passim*

*Wisniewski v. Pontiac Sch. Dist.*,
    862 F. Supp. 2d 586 (E.D. Mich. 2012) ......................................................31

## STATUTE

42 U.S.C. § 2000e-2(a)(1)..........................................................................15

## RULES

Fed. R. Civ. P. 12(b)(6)....................................................................*passim*

Fed. R. Civ. P. 56 ...................................................................................21

Fed. R. Civ. P. 56(a)..................................................................................21

## **PRELIMINARY STATEMENT**

It is imperative to state from the outset what this case involves and what it does not. This case involves a long-term relationship that was at all times consensual. The relationship started a year and a half before any employment relationship existed between the parties. It was a relationship in which the parties freely expressed their love and affection towards one another. It was also a tumultuous relationship, at times, and the parties separated for short periods of time, only to later renew their romance. The relationship continued in this on and off fashion throughout the course of appellant's employment and even during an extended six-month period of time in which the appellant was employed elsewhere. What this case does not involve, however, is a supervisor using his managerial status to force a subordinate to endure unwanted sexual advances. Likewise, this case does not involve an employee who was forced to choose whether to succumb to unwanted sexual advances or lose her job. In fact, this case does not involve any unwanted conduct at all.

Appellant Teresa D. Nixon ("Nixon") engaged in a six-year consensual relationship with Appellee Francis J. Kysela ("Kysela"), the owner of Appellee Kysela Pere et Fils, Ltd. ("KPF" or "the Company"), a wine and spirits importer. (JA84) Despite the fact that the consensual romantic and sexual relationship began long before Nixon became employed with the Company, that Nixon concedes that

the relationship was at all times consensual, and that during her employment, Nixon made no complaints of sexual harassment or a hostile work environment, Nixon brings claims for hostile work environment and quid pro quo sexual harassment. Furthermore, even though Nixon's employment agreement expressly permitted termination in the event of unsatisfactory job performance and even though Nixon conceded that her sales record and job performance were sub-standard, she contends that her termination from KPF was impermissible. Nixon's claims are unsupported by both the facts and applicable law.

The district court's dismissal of Nixon's hostile work environment at the pleading stage in Count I of the Second Amended Complaint was proper because she failed to identify facts showing that she was subjected to unwanted conduct that was sufficiently severe or pervasive.

Similarly, the district court properly granted summary judgment in favor of Appellees on Nixon's quid pro quo sexual harassment and breach of contract claims, holding that the undisputed record did not establish that Kysela made unwelcome sexual advances toward Nixon following the cessation of their consensual relationship, that she did not suffer an adverse employment action as a result of any discriminatory animus, and that Nixon's termination was permissible under her employment contract.

Accordingly, the decisions of the district court should be affirmed.

## **STATEMENT OF THE ISSUES**

In light of the differing underlying standards that apply to the issues presented on appeal, and in an effort to more clearly articulate the specific issues before the Court, Appellant reorganizes the issues into the order they were addressed by the district court and reframes them as follows:

Issue 1: Whether the district court properly dismissed Appellant's Title VII hostile work environment claim for failure to state a claim upon which relief may be granted.

Issue 2: Whether the district court properly granted summary judgment dismissing Appellant's Title VII quid pro quo sexual discrimination claim.

Issue 3: Whether the district court should adopt a new definition of "because of sex" to include all terminations that result from the ending of a consensual relationship.

Issue 4: Whether the district court properly granted summary judgment dismissing Appellant's breach of contract claim.

## STATEMENT OF THE CASE

### I.     Factual Background

#### A.     Facts Alleged in Second Amended Complaint

In her Second Amended Complaint, Nixon alleges that she is a marketing executive with a successful career in sales.  (JA84 ¶ 8).  She alleges that KPF is a top wine a top specialty wine and spirit importer in the United States and that Kysela is the owner. (JA84 ¶¶ 9-10).  In 2013, Nixon alleges that she and Kysela began a consensual relationship that was "on again, off again." (JA85 ¶ 12-13).  Nixon alleges that Kysela encouraged her to come work for KPF in 2014. (JA85 ¶ 15).

She also alleges that Kyesla made decisions about Nixon's employment based on the status of their relationship.  (JA85).  She alleges that on three occasions, Kysela terminated her employment but that she either never really left or otherwise resumed working when they resumed their sexual relationship. (JA ¶¶ 16-20).  Nixon alleges that she believed that her ability to keep her job was based on the continuation of their sexual relationship.  (JA86 ¶ 24).

Nixon alleges that Kysela, at times, singled Nixon out for criticism in front other employees during sales meetings, such as for texting on her phone during a meeting, when others were not. (JA85 ¶ 25).  Nixon also alleges that on occasions, Kysela did not make her a sales folder to embarrass her, contrived criticism about her job performance, and required her to sign a document that she would not pursue

a civil action after she was sent a sexually explicit photo by another employee. (JA86-87, ¶¶ 26-28).

Nixon alleges that she resigned from KPF in January 2019, but later returned to the Company and signed a new employment agreement on July 31, 2019. (JA87 ¶¶ 30-31).

Nixon also alleges that Kysela engaged in actions intended to control her and keep her in a sexual relationship with him such as by co-signing a loan with Nixon, allowing her to use the funds, agreeing that she would repay the loan and offering her an employment contract with a duration of five years or until the loan was refinanced.   (JA88 ¶¶ 40-41).  Nixon also alleges that prior to her employment at KPF, Kysela purchased her home so she and her daughter could live there after her divorce.  (JA88 ¶¶ 43-44).  Nixon also alleges that Kysela let her take his prescription medication and that she became addicted.  (JA¶ 48).

Nixon alleges that she terminated her relationship with Kysela on September 29, 2019 and that Kysela terminated her employment with KPF the same day.

## B.    **Undisputed Material Facts**

### Nixon and Kysela's Relationship

Nixon and Kysela were in a consensual sexual relationship for approximately six years. From its inception in 2013 (prior to the parties' employment relationship), until its final end in September of 2019, the relationship was at all times consensual.

(JA197, JA199-200, JA202, JA229-231, JA239-240, JA241, JA266, JA326-327, JA365, JA415-416, JA433-434, JA441).

During the course of their relationship, Nixon and Kysela often expressed their feelings of love for each other during their relationship. *See e.g.*, (JA201, JA743, JA859-860, JA868). They exchanged amorous text messages, sent each other nude photographs of themselves, planned to rendezvous for sexual encounters, traveled extensively together domestically and internationally for work and pleasure, and attended family holiday events together throughout their relationship. (JA266, JA423-425, JA859-863, JA866, JA871-872, JA878-881).  Kysela was a regular visitor at Nixon's house and was close to her daughter. (JA886-888).  Nixon also willingly accepted money, gifts, jewelry, and the lavish lifestyle that Kysela provided, and admittedly jokingly referred to her vaginal area as "the goldmine." (JA426-427).

Their relationship was passionate, but tumultuous at times, and they were "on and off" throughout their six years together. (JA231-233, JA239, JA361-363). Nixon and Kysela would argue and separate for brief periods of time, yet they inevitably resumed their consensual sexual relationship within a short time. (JA454, JA368). Nixon estimated that they separated and reconciled at least 20 times during their relationship, but she admitted that they never stayed off for any real length of time. (JA231, JA238-239, JA454).

6

Nixon began working at KPF long after her personal relationship with Kysela began. (JA965-972). After she accepted employment with the Company, regardless of whether their relationship was "on or off," Nixon remained employed at KPF until she voluntarily resigned in January 2019. (JA209, JA285, JA286, JA295-296, JA365-366, JA414, JA998-1005). Indeed, when Nixon and Kysela were not together sexually, Kysela nonetheless supported Nixon's employment at the company. *See*, *e.g.*, (JA929-930, JA438; JA937-938).

Even after she resigned in January of 2019 and was working elsewhere, Nixon pursued sex with Kysela and even sent Kysela nude photos of herself. (JA424 (asking Kysela "Do you want to have sex one last time at Hampton Inn?"), JA864-865). Their on-again, off-again consensual relationship continued after Nixon left KPF and worked elsewhere. (JA414-416, JA433-434).

By the summer of 2019, Nixon sought to leave her new job. (JA436-438). In July 2019, even though her then-employer offered her more money to stay, Nixon elected to return to KPF, and she actively negotiated the terms of a new employment agreement. (JA439, JA442, JA944-961). Kysela confirmed the offer of employment in the summer of 2019 even though the two were not together romantically at the time. (JA929-931, JA445-446). Nixon ultimately returned to work at KPF in August 2019, and their consensual personal relationship again continued until it ultimately ended for good in September of 2019. (JA441).

As of September 21, 2019, the couple was "on again," and they were exchanging "I love you" text messages." (JA1156).  While Kysela was away on a business trip the, Nixon decided that she wished to terminate the relationship. (JA871, JA452-453). On September 29, 2019, Nixon told Kysela on a phone call that she wanted to end the relationship. (JA452-453). Kysela then advised Nixon that she needed to transition out of the Company. (JA453). After this call, Nixon and Kysela had no further sexual encounters, discussions about sex, or any communications about getting together or having sex.  (JA461, JA496-497).

Nixon's Employment at KPF

 Nixon's began working at KPF on February 13, 2015. (JA965-972).   She worked, and remained on payroll, continuously, through January of 2019. (JA209, JA285). In January 2019, Nixon voluntarily resigned her employment at KPF. (JA431). Up until her resignation in January 2019, Nixon had a contractual sales goal of $60,000 per month. (JA965-972, JA1011-1018, JA1029-1031). Throughout the course of her employment with KPF, Nixon hit her sales goal only once, in December 2018. (JA1041-1042). Because of this, Nixon had been counseled on her need to improve her sales figures several times during her employment. (JA270-271, JA989-990, JA1043-1047).

Because Kysela cared about Nixon and believed that she had the potential to be successful, he re-hired her in July 2019. (JA700, JA986). On July 31, 2019, Nixon

signed a new three-year employment agreement with KPF. (JA947-955). As with prior agreements, Nixon actively negotiated the terms of the new agreement. (JA439-440). Per the new employment agreement, Nixon could be terminated prior to the expiration of the term of the contract on four grounds, including "in the event of . . . Kysela's dissatisfaction with Nixon's job performance, at the discretion of Francis J. Kysela V, provided Kysela gives Nixon a 30-day written notice." (JA952).

Following the execution of this new employment agreement, Nixon's sales numbers for September 2019 were a mere $5,208, well below her monthly quota. (JA1042). By late September 2019, Kysela was dissatisfied with Nixon's performance because her sales reflected a lack of any effort, and it was clear that Nixon was unable or unwilling to put in the work required for the job. (JA993-994, JA1036). On or about September 29, 2019, Kysela advised Nixon that she needed to transition from company. (JA452-453). He confirmed this in an email to Nixon on October 1, 2019. (JA726-727, JA1048-1049).  Nixon and Kysela agreed that Nixon's final day of employment would be October 31, 2019. (JA303).[1]

---

[1] In the fall of 2019, the company was facing increased costs due to tariffs on imports and, in anticipation of lower sales as a result of the tariffs, KPF terminated several employees, including Nixon, who had only recently been rehired.  (JA725-726).

## II.    Procedural Background

On February 16, 2021, Nixon filed a Complaint containing six causes of action against Kysela and KPF: (I) Title VII – Hostile Work Environment against KPF; (II) Title VII – Retaliation and Hostile Work Environment – Termination of Employment against KPF only; (III) Breach of Contract against KPF; (IV) Gross Negligence / Willful and Wanton Conduct against Kysela and KPF; (V) Intentional Infliction of Emotional Distress against Kysela and KPF. On March 10, 2021, Appellees filed a Motion to Dismiss Nixon's original Complaint pursuant to Rule 12(b)(6) for failure to state a claim.

Rather than file an opposition, Nixon filed an Amended Complaint in which she withdrew her claim of retaliation and included claims for (I) Title VII – Hostile Work Environment against KPF, (II) Title VII – Quid Pro Quo Discrimination – Termination of Employment against KPF, (III) Breach of Contract against KPF, (IV) Gross Negligence/Willful and Wanton Conduct against KPF and Kysela, (V) Intentional Infliction of Emotional Distress, and (VI) Injunctive Relief – Declaration of Contract as Void Against Public Policy. (JA2).

On April 5, 2021, Appellees again filed a Motion to Dismiss all claims in the Amended Complaint. (JA2). On May 18, 2021, the district court granted in part and denied in part Appellees' Motion to Dismiss. The district court determined that Plaintiff failed to state a claim for relief under Count I – Hostile Work Environment

and Count V – Intentional Infliction of Emotional Distress and struck the claim for injunctive relief in Count VI.  With regard to Nixon's hostile work environment claim, the district court held that "[w]hile Nixon's allegations unquestionably describe an unhealthy relationship between her and Kysela, Nixon never raises any allegations regarding her working environment, nor does she describe how the conduct negatively impacted her performance." (JA72). The district court granted Nixon leave to amend to cure the deficiencies identified by the court. (JA72).

On May 28, 2021, Nixon filed a Second Amended Complaint that added four additional facts in an effort to support to her hostile work environment claim.[2] (JA83). On June 10, 2021, KPF filed a Motion to Dismiss Nixon's hostile work environment and gross negligence claim pursuant to Rule 12(b)(6).  (JA99).

On August 19, 2021, the district court again granted Kysela and KPF's Motion to Dismiss. The court held that Nixon had failed to plead a claim for Title VII hostile work environment because the additional allegations did not allege sufficiently severe or pervasive conduct. (JA153).

On December 27, 2021, KPF and Kysela filed a Motion for Summary Judgment as to Nixon's remaining claims for Title VII quid pro quo sexual harassment, breach of contract, and gross negligence. (JA828). The district court

---

[2] Plaintiff did not reassert any claim for Intentional Infliction of Emotional Distress (Count V) or injunctive relief (County VI). (JA96).

conducted an exhaustive review of the record, including a review of the deposition transcripts of both Kysela and Nixon in their entirety, as well as reviewing a plethora of email and text exchanges between the parties. (JA1169). On March 17, 2022, the district court granted their Motion for Summary Judgment as to all claims. (JA1203).

On April 13, 2022, Nixon filed a Notice of Appeal seeking review of the Court's August 19, 2021 Order dismissing Nixon's Title VII hostile work environment claim pursuant to Rule 12(b)(6) and the Court's March 17, 2022 Order granting summary judgment in favor of Kysela and KPF. (JA1236).

## SUMMARY OF ARGUMENT

The district court correctly concluded that Nixon failed to allege the facts necessary to maintain a Title VII hostile work environment claim and properly dismissed it pursuant to Rule 12(b)(6). Nixon failed to allege facts showing that she was subjected to harassing conduct at work that was so severe or pervasive so as to affect a material term or condition of her employment or that she endured such treatment because of her sex. Nixon's Second Amended Complaint alleges, at most, petty or rude treatment by Kysela. Such conduct does not rise to the level of severity required to maintain a Title VII hostile work environment claim. Moreover, the Second Amended Complaint identified only isolated instances over more than 5 years of employment at KPF. As the court pointed out, Nixon's allegations focused on aspects of her personal relationship, rather than her work environment.

Accordingly, Nixon's failure to allege facts showing that she was subjected to unwelcome severe or pervasive conduct based on sex in the workplace is fatal to her efforts to maintain a hostile work environment claim.

The district court also properly granted summary judgment in favor of KPF and Kysela as to Nixon's claim for quid pro quo sexual harassment. The undisputed facts show that Nixon and Kysela were at all times in a consensual sexual relationship. Therefore, as a matter of law, Nixon cannot make a threshold showing that Kysela made any unwelcome sexual advances towards her. Even when they separated, the undisputed evidence confirms that the resumption of their relationship was always consensual. In September 2019, when Nixon ended their relationship for good, Kysela took no further action to pursue Nixon romantically or make any sexual advances towards her. In addition, Nixon failed to set forth any disputed facts to show that she suffered an adverse employment action because of any discriminatory animus, *i.e.*, "because of" her sex as a female. Indeed, negative employment actions that follow the termination of a consensual relationship are not actionable unless they are linked to other or further unwanted advances. And, despite what Nixon would like the law to be, engaging in a consensual sexual relationship does not, without more, constitute sexual harassment. Given the lack of any disputed material facts on these issues, summary judgment was properly granted.

Finally, the district court properly granted summary judgment as to Nixon's breach of contract claim. Nixon's employment agreement provided that she could be terminated in certain circumstances, including in the event of Kysela's dissatisfaction with her performance. The district court held that the clear terms of Nixon's employment contract with KPF gave KPF broad discretion to terminate her employment. The undisputed facts demonstrate that Nixon consistently underperformed all other sales representatives, met her sales goals only once during her first four-year phase of employment, that when she was rehired in 2019 she showed no effort to improve performance, and that the Company had to lay off a number of salespeople at the time she was terminated. (JA724-725). Nixon also received 30 days' notice of her termination in accordance with the agreement. For these reasons, Nixon's breach of contract claim fails as a matter of law and summary judgment was correctly granted.

## **ARGUMENT**

### I. **THE DISTRICT COURT PROPERLY DISMISSED NIXON'S HOSTILE WORK ENVIRONMENT CAUSE OF ACTION UNDER FED. R. CIV. P. 12(b)(6) BECAUSE NIXON DID NOT ALLEGE THE REQUISITE SEVERE OR PERVASIVE CONDUCT NECESSARY TO PLEAD A CLAIM FOR RELIEF.**

#### A. **Standard of review under Rule 12(b)(6)**

When considering a motion to dismiss pursuant to Rule 12(b)(6), the district court considers the sufficiency of the allegations alone, taking all allegations as true,

to determine whether the allegations sufficiently state a claim for relief. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff, legal conclusions are not entitled to a presumption of truth. *Id.* at 679. It is insufficient to give "[t]hreadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

A complaint should be dismissed for failure to state a claim pursuant to Rule 12(b)(6) "if, after accepting all well-pleaded allegations in the plaintiff's complaint as true. . . it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards*, 178 F.3d at 244.

### B. The district court correctly dismissed Nixon's claim for hostile work environment.

Under Title VII, employers are prohibited from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *Walker v. Mod-U-Kraf*

*Homes*, *LLC*, 775 F.3d 202, 207 (4th Cir. 2014) (citation omitted). A party bringing a hostile work environment claim must allege four elements: (1) that there was unwelcome conduct; (2) that the unwelcome conduct was based on her sex; (3) that the unwelcome conduct was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive atmosphere; and (4) that the conduct is imputable to the employer. *Id*. at 207–08; *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011). Nixon had three attempts to plead a hostile work environment claim and fell short each time. Accordingly, the court property dismissed this claim with prejudice.

The court initially dismissed Nixon's attempt to plead a cause of action for hostile work environment in the Amended Complaint because she did not allege facts regarding her work environment or how it negatively impacted her performance. (JA72). Nixon attempted to salvage this claim in the Second Amended Complaint by including four new allegations. (JA86-87, ¶¶ 25-28). In these new allegations, Nixon alleges that during more than five years of employment, Kysela criticized Nixon in front of other employees for texting during a meeting, embarrassed her by not giving her a sales folder in a meeting, and manufactured criticisms of her job. *Id.* Nixon also alleges that she was sent an explicit photo by another employee and that Kysela required her to sign a document stating she did not wish to pursue a civil action against. (JA87, ¶ 28). These allegations continued

16

to fall far short of establishing the requisite elements of a hostile work environment claim.

### C.     Nixon failed to allege unwelcome conduct that was sufficiently severe or pervasive.

Initially, the Second Amended Complaint acknowledges that Nixon and Kysela were in a consensual relationship, thus undercutting any argument that Kysela engaged in unwanted conduct based on her gender, and it does not reflect that the work environment was hostile towards women.[3]  (*See* JA85).

In addition, the scant facts added to the Second Amended Complaint do not allege conduct that was sufficiently severe or pervasive so as to alter the conditions of Nixon's employment.  *See Walker*, *LLC*, 775 F.3d at 207. To determine whether severe and pervasive conduct has been alleged, the court must examine both objective and subjective elements. *Harris v. Forklift Sys.*, *Inc.*, 510 U.S. 17, 21–22 (1993). In assessing whether a work environment is objectively hostile, it is necessary to consider "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

---

[3] "The critical issue . . .  is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Atkins v. Smyth Cnty. Virginia Sch. Bd.*, *No. 1:18CV00048*, 2022 WL 584080, at *5 (W.D. Va. Feb. 25, 2022), *aff'd*, No. 22-1344, 2022 WL 9886714 (4th Cir. Oct. 17, 2022); *Oncale v. Sundowner Offshore Servs.*, *Inc.*, 523 U.S. 75, 80 (1998) (citation omitted).

with an employee's work performance." *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 459 (4th Cir. 2002). In order to be actionable, the "conduct must be [so] extreme [as] to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). A hostile work environment is one "pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate, thereby creating an abusive atmosphere." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 316 (4th Cir. 2008) (internal quotation marks omitted) (quoting *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007)). Mere rude treatment or callous behavior by superiors is not actionable. *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006); *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). A plaintiff must "clear a high bar in order to satisfy the severe or pervasive test." *Sunbelt Rentals, Inc.*, 521 F.3d at 315. In the case at bar, Nixon failed to allege facts sufficient to meet this high standard.

In the Second Amended Complaint, Nixon alleges only a handful of isolated incidents that allegedly occurred over the course of her five years of employment at KPF, most of which were not even objectively related to sex. The only alleged incident of "harassment" occurred on one occasion when a co-worker (not Kysela) allegedly sent Nixon and explicit photograph. Nixon does not allege that any further inappropriate conduct occurred after she complained. The Second Amended Complaint does not allege frequent, severe discriminatory conduct, physically

18

threatening or humiliating conduct, offensive utterances, or any conduct that unreasonably interfered with Plaintiff's work performance or the terms and conditions of her employment. A few minor incidents of, at best, rude behavior are inadequate to allege sufficiently severe and pervasive conduct under Title VII. *See*, *e.g.*, *Mustafa v. Iancu*, 313 F. Supp. 3d 684, 695 (E.D. Va. 2018) (holding that "isolated or scattered incidents occurring over the course of several months. . . is not pervasive enough to state a claim for hostile work environment").

Accordingly, the district court correctly held that Nixon's allegations were insufficient to meet the criteria necessary to state a hostile work environment claim under Title VII, and its decision should be affirmed. (JA155-156).

### D. The district court properly rejected Nixon's argument that an unhealthy consensual relationship amounts to a hostile work environment.

Both in the district court and on appeal, Nixon argued that Kysela's conduct within their consensual personal relationship, taken as a whole, constituted severe and pervasive conduct sufficient to state a plausible claim for a hostile work environment. *See* (JA114-116, Appellant's Br. 39). For instance, she argues that she feared losing her job if the consensual relationship ended.[4] Appellant's Br. 40.

---

[4] If the law on hostile work environment were to be extended to encompass a fear that terminating a consensual relationship would negatively impact the work environment, then virtually every consensual relationship between co-workers would give rise to a hostile work environment claim.

However, Nixon cites no authority to support the argument that this creates a hostile work environment. While these allegations may potentially be relevant to her quid pro quo claim, they do not support a hostile work environment claim.[5]  Indeed, the district court properly rejected this argument twice. (*See* JA72 ("Nixon's allegations are about whether she *had* a job or not, depending on her sexual relationship with Kysela; there are no allegations *about* her job, or  what her work environment was."); JA156 ("Nixon does not sufficiently allege that the unsavory *conditions* of her *job*— rather than her *relationship*—were so severe and pervasive as to change the conditions of her employment.")).

For the foregoing reasons, the district Court's August 19, 2021 Order dismissing Nixon's hostile work environment claim should be affirmed.

## II.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT DISMISSING APPELLANT'S QUID PRO QUO SEXUAL HARASSMENT CLAIM.

The district court properly granted summary judgment as to Nixon's quid pro quo sexual harassment claim because Nixon failed to establish a genuine issue of material fact that Kysela subjected her to any unwanted sexual advances during her

---

[5] Though claims of quid pro quo sexual harassment and hostile work environment are both claims of gender discrimination, they are distinct causes of action governed by different analytical standards. The differing analytical standards governing each theory of gender discrimination mean that allegations sufficient to establish one claim, e.g., quid pro quo, do not necessarily support an action based on another claim, e.g., hostile work environment. *Desouza v. Off. of Child. & Fam. Servs.*, No. 18CV2463PKCSMG, 2019 WL 2477796, at *4 (E.D.N.Y. June 12, 2019).

employment or that any alleged harassment or employment action was based on sex. This decision should be affirmed.

### A.    Standard of review pursuant to Fed. R. Civ. P. 56.

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id*. (citation omitted).

To state a claim for quid pro quo sexual harassment, Nixon must establish: (1) that she belongs to a protected group; (2) that she was subject to *unwelcome* sexual harassment; (3) that the harassment was based upon sex; (4) her reaction to the harassment affected tangible aspects of her compensation, terms, conditions, or privileges of employment; and (5) the employer knew or should have known of the

harassment and took no effective remedial action. *Okoli v. City of Balt.*, 648 F.3d 216, 222 (4th Cir. 2011); *U.S. EEOC v. Appalachian Power Co.*, No. 1:18CV00035, 2019 WL 4644549, at *6 (W.D. Va. 2019). In essence, a plaintiff must prove that a "tangible employment action resulted from a refusal to submit to a supervisor's sexual demands." *Moser v. MCC Outdoor, L.L.C.*, 256 F. App'x 634, 642 (4th Cir. 2007) (citation omitted).

### B. Quid pro quo sexual harassment in the context of consensual workplace relationships requires an unwelcome sexual advance *after* termination of the relationship.

As a threshold matter, the court must first consider whether the alleged conduct complained of was unwelcome. *See Okoli*, 648 F.3d at 222. "Advances are unwelcome if the plaintiff regarded them as undesirable or offensive and did not solicit or incite them." *Briggs v. Waters*, 484 F. Supp. 2d 466, 478 (E.D. Va. 2007) ("The plaintiff's response to the advances provides evidence of unwelcomeness."). Importantly, a sexual advance cannot be unwelcome if the parties are in a consensual sexual relationship. *Campbell v. Masten*, 955 F. Supp. 526, 529 (D. Md. 1997) (finding no basis to infer that the sexual advances were unwelcome where the plaintiff had conceded that the relationship was consensual).

Federal courts, including the Eastern District of Virginia, have routinely acknowledged that, "negative employment actions which follow on the heels of a consensual relationship gone sour do not constitute quid pro quo sexual harassment

*unless they are linked in some way to other or further 'unwanted' sexual advances*."

*West v. MCI Worldcom, Inc.*, 205 F. Supp. 2d 531, 545 (E.D. Va. 2002) (quoting

*Campbell*, 955 F. Supp. at 530) (emphasis added).[6]  In *West*, the plaintiff ended her

consensual relationship with the team leader of her contract assignment and was later

removed from the contract. *Id* at 535, 536. The court held that the plaintiff could not

establish the third element of her quid pro quo harassment claim – that her removal

was "because of sex" – because she failed to come forward with evidence of

unwanted sexual advances by her team leader *after* the termination of the

relationship. *Id.* at 545. Notably, the court did hold that an employer must retain an

employee after termination of a consensual relationship, nor did the court opine that

evidence of some intervening reason (such as jealousy over the employee dating

someone else) was required to defeat a claim of quid pro quo sexual harassment.

Instead, the court focused on whether there was any unwelcome conduct after the

---

[6] *See also Novak v. Waterfront Comm. of New York Harbor*, 928 F. Supp. 2d 723, 730-31 (S.D.N.Y. 2013) (mistreatment following breakup of consensual sexual relationship, "while unfair and unfortunate, does not constitute Title VII sex discrimination "); *Conklin v. Suffolk*, 859 F. Supp. 2d 415, 428 (E.D.N.Y. 2012) ("Courts often find that harassment by a co-worker is not considered to be 'based on sex' when it arises from a failed relationship"); *Stepheny v. Brooklyn Hebrew Sch. for Special Children*, 356 F. Supp. 2d 248, 263 (E.D.N.Y. 2005) ("Conduct motivated by personal animosity does not run afoul of Title VII's prohibition against altering the terms and conditions of employment because of sex"); *Keppler v. Hinsdale Tp. High Sch. Dist. 86*, 715 F. Supp. 862, 869 (N.D. Ill. 1989) (observing that when intimate workplace relationships end, the "consequences are the result not of sexual discrimination, but of responses to an individual because of her former intimate place in her employer's life").

termination of the consensual relationship. *Id.* In that case, there was no unwanted sexual advances after the termination of the consensual relationship, and the court, therefore, dismissed all claims of quid pro quo sexual harassment. This case warrants the same result.

>### 1. Nixon and Kysela were in a consensual romantic relationship and no unwelcome sexual advances occurred after their relationship ended.

The record is devoid of any evidence reflecting an unwanted sexual advance by Kysela because Nixon admits that their sexual relationship was at all times consensual. It is undisputed that beginning in the fall of 2013 – long before Nixon began working for KPF – she and Kysela began a consensual, on-again, off-again sexual relationship that lasted until September 2019. (JA197, JA199-200, JA202, JA229, JA230, JA239, JA241, JA266, JA326-327, JA365, JA402-203, JA415-416, JA433-434, JA441, JA436). Nixon and Kysela's relationship continued in this manner throughout Nixon's employment at KPF. *Id.*

Nixon and Kysela were a couple. Nixon frequently told him that she loved him, cared about him, and could not live without him. *See*, *e.g.* (JA201, JA266, JA423-425, JA859-863, JA866, JA868, JA871-872, JA878-881). They exchanged amorous text messages, sent each other nude photographs of themselves, and planned to rendezvous for sexual encounters. *Id.* Nixon and Kysela traveled extensively together, and Kysela was a fixture at Nixon's family holiday gatherings

for years. *Id.*  Kysela and Nixon saw each other multiple times per week, and Kysela was close to her daughter. (JA886-888). Contrary to what is alleged in the Second Amended Complaint, their sexual relationship was not a transactional, quid pro quo arrangement. Rather, the undisputed evidence reflects that Nixon and Kysela were in a consensual relationship in which they cared about each other for years.

Although consensual, their relationship was sometimes volatile and the two had a cyclical pattern of dating, fighting, and separating for short periods of time. Yet, they always resumed their consensual relationship soon thereafter. (JA231-233, JA238-239, JA361-262, JA454). Even when they were going through an "off" period in their personal relationship, communications between the parties underscore their genuine feelings for each other. On October 4, 2016, the day after she signed a new employment agreement, Nixon told Kysela "I still love you too…I just don't think we can be together. We drive each other nuts." (JA891).  In June 2017, when they were separated but Nixon was employed at KPF, Nixon wrote "I know you loved me and I loved you and still do." (JA896).

In August 2017, when the two discussed separating, Nixon expressed that she loved Kysela and wanted a commitment from him.  (JA903-913). Nixon went on to write that she was frustrated with their relationship because she was "tired of 5 minute office sex and need more passion. I'm not fulfilled when we have office sex all the time." *Id.* Nixon's declaration that brief sexual trysts in the office were not

fulfilling her is plainly at odds with her allegation that she felt pressured to maintain her sexual relationship with Mr. Kysela only to keep her job. In September 2018, after a heated exchange in which the two blamed each other for the deterioration of their personal relationship, Nixon concluded by writing, "One last thing. I do love you and will always. I don't want to fight with you." (JA915).

In January 2019, Nixon resigned her employment at KPF. After Nixon gave notice of her resignation from KPF – and therefore had no need to engage in sexual relations to maintain her employment – she sent Kysela a text message saying "Do you want to have sex one last time at Hampton Inn? It's kinda symbolic." (JA864-865).  A few days later, Nixon texted Kysela nude photographs of herself. (JA423-424). Nixon's overtures towards Kysela after she had resigned vitiate any claim that she felt pressured to have sex with Kysela to keep her job.

Their on and off consensual sexual relationship continued after Nixon's resignation in early 2019 and while she was employed elsewhere. (JA197, JA199-200, JA202, JA229, JA230, JA239, JA241, JA266, JA326-327, JA365, JA433-434, JA441). In July 2019 Nixon voluntarily returned to work at KPF even though she had received other job offers and had been offered more money to stay at her current job. (JA439, JA442, JA944-961). When discussing her return to KPF and her frustrations with their personal relationship, Nixon told Kysela "I love you and want things to go well...but I also want to be treated like I matter and I'm part of your

life." (JA931). Nixon and Kysela's on-again, off-again consensual relationship continued when she returned to KFP until they finally separated for good in September 2019. (JA445-446, JA929-931, JA962-964).

According to Nixon, she informed Kysela that she wanted to end the relationship on September 29, 2019 and Kysela then told her that she would need to transition out of the company. (JA452-453). Importantly, however, after this conversation, there were no sexual encounters, no discussions about sex, and no communications about getting together or having sex. (JA61, JA496-497). In other words, there were no unwelcome sexual advances by Kysela, after their consensual relationship had ended for good.

In sum, the undisputed evidence shows that Nixon and Kysela were in a six-year, on and off relationship that was at all times consensual, that Nixon admittedly cared about Kysela and told him she loved him even when they were not in a sexual relationship, that Nixon pursued him sexually after resigning from KPF, that they maintained their on and off relationship even when she was not working at the Company, and that after their relationship ended in September 2019, there were no further discussions about sex. Accordingly, Nixon's quid pro quo sexual harassment claim fails as a matter of law, and the district court's decision should be affirmed on this basis.

## 2.    No unwanted sexual advances occurred in the final period of Nixon's employment.

As in the proceedings below, Nixon concedes on appeal that no unwanted conduct occurred from the time Nixon began her employment at KPF in 2015 until her return to the company in the summer of 2019.  Appellant's Br. 17.   Instead, Nixon argues that the district court erred in granting summary judgment because there were three instances of unwanted sexual advances during the last period of Nixon's employment, which commenced in August of 2019.  Nixon's argument is undercut entirely by the undisputed facts and offers no basis for reversal of the lower court's decision.

### i.    No unwelcome advance occurred in August 2019.

Nixon argues on appeal that the resumption of the consensual relationship in August of 2019 gives rise to an inference that unwelcome conduct preceded that occurrence. The fundamental flaw with that argument is that Nixon does not identify any unwelcome conduct at all at any time in or around August of 2019.

On August 4, 2019, after Nixon had executed her new contract for employment at KPF with a start date of August 19, 2019, Nixon told Kysela in an email that she wanted to end their personal relationship, just as they had both done approximately 20 times before. (JA963). This was par for the course, as it is undisputed that Nixon and Kysela frequently separated for brief periods of time, and later voluntarily and consensually resumed their relationship. Nixon testified that

28

this separation was "short lived" and offered no evidence that her resumption of the relationship was anything but voluntarily. (JA299-300). Furthermore, after Nixon sent the August 4, 2019 email, Kysela nonetheless reiterated she had a job at KPF. (JA299-300, JA962). This runs contrary to Nixon's theory that her job depended on the existence of their sexual relationship.

Importantly, in her brief, as in the proceedings below, Nixon fails to identify any actual "advance" by Kysela in this timeframe, much less one that was unwelcome. This is fatal to her argument. She does not identify any action by Kysela or when it supposedly occurred. Rather, she speculates that because "the two ended up back in a sexual relationship" after she purported to end it (as they had done in the past), the relationship must have been unwelcome. Appellant's Br. 17. This amounts to nothing more than conjecture, which cannot be used to defeat summary judgment. *Glover v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001) ("Mere speculation by the non-movant cannot create a genuine issue of material fact."). To defeat summary judgment, Nixon must come forward with *facts* supporting the essential elements of her claim. Moreover, Nixon's unsupported argument that she "gave in" to sex is contradicted by her own deposition testimony in which she admits that her relationship with Kysela throughout August 2019 was,

29

in fact, voluntary and consensual. (JA433-434, JA835-836 at ¶¶ 15, 19, JA1069 at ¶¶ 15, 19).[7]

Based on the undisputed facts, the court properly rejected Nixon's argument that an unwelcome advance occurred in August 2019, and this court should reach the same conclusion.

### ii.    No unwelcome advance occurred in September 2019.

Nixon's argument that she experienced an unwelcome sexual advance on September 24, 2019 is also untenable. Appellant's Br. 19.  Nixon's testimony and sworn statements in this case are that she and Kysela maintained a sexual relationship through September 20, 2019, that Kysela then went on a trip abroad, and that while he was away, she determined that she wanted to end their personal relationship.  (JA871, JA452-453). In an email on September 25, 2019, Nixon expressed that she did not want to be involved personally, and when they spoke on September 29, 2019, she said "we need to keep this business only. As for the

---

[7] Nixon also tries to create a fact dispute by injecting an out of context statement by Kysela into this argument.  When asked at his deposition if Mr. Kysela desired for Nixon to return to KPF because of his sexual relationship with her, he confirmed that they were in a six-year consensual relationship and that they would fight like any couple, it would end for a short duration, but that was it.  (JA700-701). He went on to state "[i]t was all one thing." *Id.* Kysela explained his willingness to hire Nixon: "I love Teresa and I like taking care of her and I like giving her a second chance." (JA693). In other words, Kysela's desire for Nixon – his girlfriend – to work at KPF was not surprising given that they were a couple and that he loved her. Kysela's statement cannot be construed as evidence of a malevolent plan to keep her sexually attached to him.

personal relationship, it's over." (JA452-453). Nixon also testified that on the same call Kysela advised her that she needed to transition out of the company, and that there were no further sexual advances following the call. (JA88 ¶ 37, JA460-461, JA495-496, JA871, JA1158-1159). This series of facts cannot support a Title VII quid pro quo harassment claim because there was no unwanted sexual advance *after* the termination of their relationship. *See West*, 205 F. Supp. 2d at 545 (requiring other or further unwanted sexual advances *after* the end of a consensual relationship).

In a weak attempt to contort the facts, Nixon asks the court to disregard her testimony and evidence about the timeline of the final period of their relationship. Although Kysela testified that he believed the relationship was deteriorating in September of 2019, Nixon's testimony makes clear that *she* understood that they were still in a personal relationship when he emailed her on September 23 to request a meeting. (JA460-461, JA495-496, JA871, JA1158-1159). Indeed, the two were still telling each other that they loved each other over text message as of September 21, 2019. (JA1156). Evidence that Nixon "engaged in behavior similar to that which she claimed was unwelcome or offensive" is evidence that the behavior was not unwelcome. *See Wisniewski v. Pontiac Sch. Dist.*, 862 F. Supp. 2d 586, 597 (E.D. Mich. 2012) (citing *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 966 (8th Cir. 1999)). Based on the undisputed facts, Nixon cannot now argue that Kysela's September 23

request to meet with her, which was made prior to Nixon's termination of the relationship, was an unwelcome advance that occurred after the termination of the consensual relationship.

More importantly, the September 24-25, 2019 email chain cited by Nixon does not amount to a sexual advance at all, much less an unwanted one. Kysela emailed Nixon on September 23, 2019 to ask her two work-related questions: (1) if she had reviewed certain client purchases and (2) whether she had "time to meet Sunday night at around 6:45 to discuss business, and rental inspections." (JA1162). Nixon responded that she would have to let him know about the meeting because she might be away and not available until Monday. *Id.* Nixon subsequently stated that meeting "on Monday would be fine" instead, and Kysela stated that he had a trade show in Richmond on Monday and could not meet. (JA1105). On September 24, 2019, they agreed to talk by phone upon his return from his trip on September 29. (JA1104). The two then went on to exchange emails in which Kysela inquired about what Nixon would be doing on Sunday that made her unavailable and Nixon accused Kysela of being mean. (JA1103-1106). On September 25 Nixon told Kysela she did not want to be involved with him personally. *Id.*

There is nothing in *any* of these email exchanges that could be construed as a sexual advance. Kysela asked if she has time to meet to discuss two specific business matters. (JA1162). Kysela did not invite himself over to her house or suggest a

meeting place from which it could be inferred that he intended they would be intimate. Nixon asks the Court to make a series of unreasonable inferences that an email about meeting to discuss work matters is code for "let's have sex"[8] and that Nixon's unavailability to meet in person (even though she offered to meet on another day) amounted to a rejection of a request for sex. Appellant's Br. 19. This is pure conjuncture, and such assumptions cannot be used to create a genuine issue of fact as to whether an unwanted advance was made. *See West*, 205 F. Supp. at 544. ("West's unsubstantiated belief that Quale was calling her at home for the purpose of resuming their sexual relationship does not create a genuine issue of fact as to whether Quale made an unwanted sexual advance. West's conclusory and speculative belief standing alone is therefore insufficient to withstand summary judgment.").

Nixon also now argues that two isolated statements during the course of their subsequent email exchange amount to an unwelcome sexual advance: "Behave and we will be fine" and "relax here. We will be fine." Appellant's Br. 22. These statements also lack any indication that they were sexual advances. Indeed, Nixon concedes that "the comments themselves are not objectively sexual." *Id.* Yet, Nixon

---

[8] Although Nixon argues that couples do not ask each other for sex by saying "let's have sex," Nixon and Kysela discussed their sexual desires in such clear terms. For example, Nixon sent Kysela a text message after resigning her employment from KPF stating, "Do you want to have sex one last time at Hampton Inn?" (JA864-865).

asks the court to accept the unwarranted inference that these vague phrases mean "Kysela was reminding Nixon that his financial support (including her employment) came with her being sexually submissive, and that she needed to submit." No reasonable reading of this language would support such an inference. Accordingly, the court correctly held that the language did not constitute an unwanted sexual advance.

Contrary to Nixon's argument, dismissal of Nixon's quid pro quo claim will not render sweeping precedent under which an employee involved in a consensual relationship would never be able to establish a claim of sexual harassment. The simple fact is, that in order to establish a quid pro quo claim, a plaintiff must be able to point to some unwanted sexual advance and must be able to establish that the termination of employment was based on a refusal to submit to the unwanted sexual advances. In this case, with these unique facts, Nixon could not satisfy either of these requirements.

Given the undisputed facts, the court's entry of summary judgment on Nixon's quid pro quo sexual harassment claim was correct and should be affirmed.

### C. The District Court Correctly Held that the Undisputed Facts Did Not Support a Finding that Nixon was Terminated "Because of Sex."

There are no facts to support, or even a suggest, that Nixon suffered any adverse employment action based on her sex and the district court correctly held the same.

Courts have recognized that when an employee chooses to become involved in an intimate affair with her employer, "an element of her employment relationship is removed from the workplace, and in the realm of private affairs people do have the right to react to rejection, jealousy and other emotions…." *Keppler v. Hinsdale Twp. High Sch. Dist. 86*, 715 F. Supp. 862, 869 (N.D. Ill. 1989). Indeed,

> [s]uch an employee, of course, always has the right to terminate the relationship and to again sever private life from the workplace; when she does so, she has the right, like any other worker, to be free from a sexually abusive environment, and to reject her employer's sexual advances without threat of punishment. Yet, she cannot then expect that her employer will feel the same as he did about her before and during their private relationship. Feelings will be hurt, egos damaged or bruised. The consequences are the result not of sexual discrimination, but of responses to an individual because of her former intimate place in her employer's life.

*Id.* (granting summary judgment and holding that even if a superior did seek retribution against a subordinate "for abandoning their relationship. . . the most she has shown is that [the superior] reacted harshly to their failed relationship").

In the case at bar, the record shows, at best, that in addition to her unsatisfactory performance, Nixon was terminated in part because of the end of her

relationship with Kysela. This does not – as Nixon suggests – equate to being terminated for rejecting unwanted sexual advances, and it does not equate to being terminated "because of sex." Under a quid pro quo sexual harassment theory in the context of a failed consensual relationship, Nixon must come forward with some evidence of unwanted sexual advances after termination of her relationship with Kysela to demonstrate that the decision to terminate Nixon was "because of sex." *West*, 205 F. Supp. 2d at 545 (*citing Campbell*, 955 F. Supp. at 530 ("Negative employment actions which follow on the heels of a consensual relationship gone sour do not constitute quid pro quo sexual harassment unless they are linked in some way to other or further 'unwanted' sexual advances.")); *see Holtz v. Marcus Theatres Corp.*, 31 F. Supp. 2d 1139, 1145 (E.D. Wis. 1999) (granting summary judgment on plaintiff's quid pro quo claim where she failed to present evidence of any demands for sexual favors after termination of sexual relationship). Having failed to do so, Nixon cannot establish a prima facie sexual harassment claim.

Courts have consistently drawn the distinction between "actions based on discriminatory animus and those based on personal animosity resulting from failed consensual relationships." *West*, 205 F. Supp. 2d at 545*; see also Pipkins v. City of Temple Terrace*, *Florida*, 267 F.3d 1197, 1199 (11th Cir. 2001) (finding that alleged harassment after failed relationship was taken because of disappointment over the breakup rather than plaintiff's gender). The former is actionable under Title VII and

the latter is not because "such a motivation is not 'because of sex.'" *West*, 205 F. Supp. 2d at 545 (quoting *Oncale*, 523 U.S. at 80-81).

In the case at bar, the record is entirely void of any evidence that would justify even the inference that Nixon's termination was motivated by discriminatory animus. Her termination "came on the heels of a consensual relationship gone sour." *See West*, 205 F. Supp. 2d at 545 (citation omitted). As such, it does not, and cannot, rise to the level of quid pro quo sexual harassment.

## III.    THE COURT SHOULD NOT OVERTURN EXISTING PRECEDENT

Nixon requests that this Court "correct the District Court's detour and establish an improved path for reviewing 'because of sex' cases." Appellant's Br. 31. Essentially, Nixon argues that "because of sex" should be expanded to include the ending of a consensual sexual relationship. Appellant's Br. 32. Under Nixon's theory, any adverse action taken against a former lover would always give rise to a quid pro claim of sexual harassment – regardless of whether there was any unwanted conduct and regardless of whether the adverse action was taken for purely personal reasons unrelated to sex. Essentially, Nixon is requesting that the Court rewrite the law on quid pro quo claims and overturn numerous cases and holdings in numerous jurisdictions, including within this Circuit, under which Courts have consistently recognized that terminations that occur as the result of the cessation of consensual relationships – without more – simply do not give rise to quid pro claims of sexual

harassment. Indeed, even the Supreme Court has recognized that "The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" *See Meritor Savings Bank*, *FSB v. Vinson*, 477 U.S. 57, 68 (1986). There is no reason for the court to adopt Nixon's proposed expansion of the law.

Ultimately, because there were no unwanted sexual advances made after termination of the relationship, any claim of quid pro quo discrimination necessarily fails as a matter of law. The district court's decision granting summary judgment should be affirmed.

## IV. THE COURT PROPERLY GRANTED SUMMARY JUDGMENT ON NIXON'S BREACH OF CONTRACT CLAIM BECAUSE SHE WAS TERMINATED IN ACCORDANCE WITH HER EMPLOYMENT AGREEMENT.

Nixon argues in her appeal that the dismissal of the contract claim was improper because there are questions of fact that render summary judgment inappropriate. Appellant's Br. 38. Nixon does not, however, identify a single fact that she claims to be in question with respect to her contract claim. Instead, Nixon makes it clear from the outset that her appeal on the contract claim is premised exclusively on her assertion that the Title VII claim was improperly dismissed. Appellant's Br. 38. Essentially, Nixon argues that the Title VII claim should not have been dismissed, and that if it survives the contract claim should also survive. By inference, under Nixon's theory, the converse would be true as well. As is demonstrated above, the district court's dismissal of the Title VII claims was proper,

was supported by established case law and should not be reversed. The district court's dismissal of the contract claim was equally well supported and should not be overturned.

Furthermore, with respect to the breach of contract claim, the district court found that Nixon was terminated in accordance with the unambiguous terms of the contract. (JA1228). The court held that KPF had broad discretion to terminate Nixon if her work was not satisfactory. (JA1229). The district court noted that the undisputed evidence demonstrated that Nixon had extremely low sales numbers, that two key employees testified that they were not in favor of rehiring Nixon because she was "not a good wine salesperson" and "was in the bottom quarter" of salespeople at the Company. (JA1229-1230). Kysela confirmed that Nixon's poor sales performance reflected that she was unable or unwilling to do the work required for the job. (JA725, JA1035).

Additionally, at the time of Nixon's termination, the Company was facing the imposition of new import tariffs that were anticipated to lead to a slowdown in sales. Accordingly, the Company had to reduce its salesforce as a cost cutting measure. (JA724-726). Nixon, as someone only recently rehired and as someone who was not meeting sales goals or showing any effort to do so, was one of four salespersons that were let go during this timeframe. *Id.*

The Court acknowledged Nixon's argument that Kysela may have been unhappy with their personal relationship but noted that based on the undisputed record showing Nixon's poor performance, Kysela could both be unhappy with their personal relationship and dissatisfied with her work performance, rendering the termination well within the provisions of the employment contract. (JA1229). Given these undisputed facts, the district court determined that Kysela's decision to exercise his discretionary right to terminate Nixon for unsatisfactory performance complied with the terms of the contract. *Id.*

On appeal, Nixon does not argue that she did not receive notice of her termination as required by the contract, that her performance was anything other than unsatisfactory during any phase of her employment, or that there was not an adequate reason for her termination pursuant to her contract. Indeed, she concedes these facts in her brief. Appellant's Br. 5, 38-39. Instead, Nixon's position is that Kysela should be forced to refrain from exercising his contractual discretionary right to terminate an employee with poor performance simply because she had been in a consensual sexual relationship with him, which ended. Nixon cites no authority for this proposition. It simply is not the law, nor should it be.

Nixon has identified no reason to justify reversal of the district court's decision granting summary judgment on Nixon's breach of the contract claim, and the lower court's decision should be affirmed.

## **<u>CONCLUSION</u>**

For the reasons set forth herein, Appellees respectfully request that the Court affirm the decision of the district court.

Respectfully submitted,

KYSELA PERE ET FILS, LTD.
FRANCIS J. KYSELA
By Counsel

CARR MALONEY PC

By:   */s/ Thomas L. McCally*
Thomas L. McCally
Sarah W. Conkright
2000 Pennsylvania Avenue, NW
Suite 8001
Washington, D.C. 20006
202-310-5500 (Tel)
202-310-5555 (Fax)
thomas.mccally@carrmaloney.com
sarah.conkright@carrmaloney.com

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*9,693*] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.      This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>October 27, 2022</u>             <u>/s/ Thomas L. McCally</u>
                                                          *Counsel for Appellees*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 27th day of October, 2022, I caused this Brief of

Appellees to be filed electronically with the Clerk of the Court using the CM/ECF

System, which will send notice of such filing to the following registered CM/ECF

users:

    John C. Cook
    Philip C. Krone
    Cook Craig & Francuzenko, PLLC
    3050 Chain Bridge Road, Suite 200
    Fairfax, Virginia  22030
    (703) 865-7480

    *Counsel for Appellant*

                /s/ Thomas L. McCally
                *Counsel for Appellees*