**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-1406

TERESA D. NIXON,

        Plaintiff – Appellant,

  v.

KYSELA PERE ET FILS, LTD.; FRANCIS J. KYSELA, V,

        Defendants – Appellees.

Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg. Thomas T. Cullen, District Judge. (5:21-cv-00011-TTC-JCH)

Argued: December 5, 2023　　　　　　　　　　　　　　　　Decided: August 6, 2024

Before AGEE, QUATTLEBAUM, and BENJAMIN, Circuit Judges.

Affirmed in part, and vacated and remanded in part by unpublished opinion. Judge Benjamin wrote the opinion, in which Judge Agee and Judge Quattlebaum joined.

**ARGUED:** John Charles Cook, COOK CRAIG & FRANCUZENKO, PLLC, Fairfax, Virginia, for Appellant. Sarah Wood Conkright, CARR MALONEY PC, Washington, D.C., for Appellees. **ON BRIEF:** Philip C. Krone, COOK CRAIG & FRANCUZENKO, PLLC, Fairfax, Virginia, for Appellant. Thomas L. McCally, CARR MALONEY PC, Washington, D.C., for Appellees.

Unpublished opinions are not binding precedent in this circuit.

DEANDREA GIST BENJAMIN, Circuit Judge:

Teresa Nixon sued her former employer, Kysela Pere et Fils, Ltd. ("KPF"), after she was terminated from her employment. She brought claims for hostile work environment in violation of Title VII of the Civil Rights Act of 1964, *quid pro quo* sexual harassment in violation of the same, and breach of her employment agreement. The district court held that she failed to state a claim for hostile work environment under Federal Rule of Civil Procedure 12(b)(6), and it entered summary judgment in favor of KPF on the *quid pro quo* and breach of contract claims.

We agree that Nixon's allegations are insufficient to state a hostile work environment claim, so we affirm the court's judgment on that front. However, we hold that summary judgment on the remaining claims was unwarranted under the current record. Accordingly, we vacate that portion of the district court's judgment and remand for further proceedings consistent with this opinion.

I.

A.

This case arises from a workplace romance.[1] In 2013, Teresa Nixon and Francis Kysela initiated an affair. At that point, they were not yet colleagues, only lovers. Their

---

[1] We recite the facts and draw reasonable inferences in Nixon's favor. *See Laurent-Workman v. Wormuth*, 54 F.4th 201, 206–07 (4th Cir. 2022) (accepting factual allegations as true at the 12(b)(6) stage); *Okoli v. City Of Baltimore*, 648 F.3d 216, 217 (4th Cir. 2011) (viewing all facts and reasonable inferences in favor of the nonmovant at the summary judgment stage).

2

relationship, at times, was amorous. Nixon loved Kysela "deeply," and Kysela loved Nixon "like no woman [he] [had] been with." J.A. 911, 898. But it was also troubling. Kysela supported Nixon financially, yet it was not unconditional. In "negotiating [their] relationship," Kysela demanded that Nixon agree to certain terms: she would not handle money, for instance, and sexually, she would "need to be submissive." *Id.* at 749, 1110. He once warned her, "If you take care of me, I take care of you . . . you deny me and we have issues." *Id.* at 1059.

Their six years together were volatile, to say the least. Nixon estimates they separated and reconciled more than 20 times. And to complicate matters, over a year into their affair, Kysela hired Nixon as a sales representative at his wine and spirits distribution company, KPF. Unsurprisingly, their professional relationship proved tumultuous. Kysela terminated Nixon's employment whenever they broke up, only to rehire her once they reunited. While Nixon was supposedly terminated, she remained on the payroll and "did a few odd jobs" because Kysela "wanted to take care of her." *Id.* at 662. Despite this turmoil, Nixon remained with KPF until January 2019, when she voluntarily resigned.

Then, in late July 2019, Kysela rehired Nixon. He told her she was "a very good business person and an asset[] to any company." *Id.* at 921. She signed a new employment agreement with KPF, which was governed under the laws of Virginia, where the company is based. It established a three-year term of employment for Nixon, from August 19, 2019, through August 18, 2022, which could be terminated prematurely in the event of:

> a. Conduct by Nixon evidencing substance or alcohol abuse or dependency, disloyalty, dishonesty or any other conduct

3

> in contravention of the financial and business interests of [KPF]; or
>
> b. Nixon's failure to generate and attain minimum monthly sales of $70,000.00 per month by May 19th, 2020, which is nine (9) months from the beginning of this Agreement; or
>
> c. Nixon's breach of the terms and provisions hereof; or
>
> d. [KPF's] dissatisfaction with Nixon's job performance, at the discretion of Francis J. Kysela V, provided [KPF] gives Nixon a 30-day written notice.

*Id.* at 952.

In this new chapter, Nixon and Kysela swore off each other romantically. Nixon told Kysela she was "happy to return to work with [him]," but she would not "entertain seeing [him] on a personal level ever again." *Id.* at 963. Kysela assured Nixon that "[her] personal life is [her] personal life." *Id.* at 962. But old habits die hard, and in a familiar pattern, the two rekindled their relationship. In early September 2019, Nixon suggested she might leave KPF, but Kysela told her he wanted her to stay, as she was "a good sales agent." *Id.* at 867.

Finally, Nixon and Kysela broke up for good. Nixon claims she broke up with Kysela on September 29, after he returned from a Europe trip. But Kysela remembers things differently. In his deposition, he testified that they "both" ended the relationship sometime in "early September," "way before" he traveled to Europe. *Id.* at 722–23.

Nixon's assertions—and various documents in the record—indicate the following facts regarding the breakup, which we must assume are correct at this stage of the proceedings. The week before Kysela left for Europe, he and Nixon exchanged "Love

4

you" text messages and spent two evenings together. *Id.* at 1156. While Kysela was overseas, however, Nixon decided "to end [her] role in his life on a personal level." *Id.* at 452. On September 23, during his trip, Kysela emailed Nixon requesting to "meet Sunday night," September 29, "to discuss business." *Id.* at 1162. This request was typical from Kysela, and his intention "was normally to fulfill his sexual needs." *Id.* at 1159. In response, Nixon asked to talk by phone or meet instead on Monday, September 30. On September 25, they exchanged the below emails:

> **Nixon:** "Just so I'm clear and available will you be calling me [Sunday] at 6:45pm?" *Id.* at 1104.
>
> **Kysela:** "Yes[,] oh difficult one. We will talk by phone. Not your usual argument[.] Be correct on Sunday please." *Id.*
>
> **Nixon:** "What do you mean . . . be correct?" *Id.*
>
> **Kysela:** "Look for solutions. Not your normal emotional venting." *Id.*
>
> **Nixon:** "It's business only. Nothing to vent about." *Id.*
>
> **Kysela:** "You love to vent[.]" *Id.* at 1103.
>
> **Nixon:** "I have nothing to vent to you[.] We've said all that needs to be said. It's over and done however, I do like a good conversation and will keep it to business. Try to be nice[.]" *Id.*
>
> **Kysela:** "You're the problem child[.] Behave and we will be fine." *Id.*
>
> **Nixon:** "Stop being so mean. I don't have a problem with you at all. I just don't want to be involved personally. It's not a healthy situation." *Id.*
>
> **Kysela:** "You have many issues. I have tried to help you over the years[.] Relax here. We will be fine[.]" *Id.*

5

According to Nixon, that Sunday, when she and Kysela connected by phone, she ended the relationship once and for all. Kysela responded, "you will need to transition out of the company," and he confirmed as much in writing. *Id.* at 453. In his deposition, Kysela testified that he was "unhappy with her work performance." *Id.* at 725. He explained that in her entire tenure at KPF, she only hit her monthly sales target once. The Vice President of Sales at KPF said something similar: Nixon "was always at the bottom of the rung" in the sales hierarchy. *Id.* at 988–89. Nixon's last day at the company was October 31, 2019.

B.

Nixon brought several claims against both Kysela and KPF, but only three claims against KPF are relevant for our purposes: (1) hostile work environment in violation of Title VII; (2) *quid pro quo* sexual harassment in violation of the same; and (3) breach of contract. KPF moved to dismiss those claims under Rule 12(b)(6). The district court dismissed Nixon's hostile work environment claim but granted her leave to amend the complaint as to that claim. *Nixon v. Kysela Pere Et Fils, Ltd.*, Civil Action No. 5:21-cv-00011, 2021 WL 1996063, at *3 (W.D. Va. May 18, 2021).

Nixon amended her complaint to include additional allegations bolstering her hostile work environment claim:

- "Mr. Kysela at times singled Ms. Nixon out for criticism in front of other employees during sales staff meetings. For example, he would criticize Ms. Nixon for texting on her phone, even though others were texting and were not criticized." J.A. 86.

6

- "On other occasions, Mr. Kysela did not make a sales folder for Ms. Nixon for a planned sales meeting, even though others in the meeting were given a folder." *Id.*

- "Mr. Kysela manufactured contrived criticisms of Ms. Nixon's job performance. For example, he took accounts away from her which made her unable to meet the annual sales bonus structure. He then claimed she failed to meet quota." *Id.* at 86–87.

- "On another occasion, Ms. Nixon was sexually harassed and sent an explicit photo by an employee. Mr. Kysela forced Ms. Nixon to sign a document saying she did not want to pursue a civil action. The person harassing her was a good friend of Mr. Kysela's son." *Id.* at 87.

- "Such actions placed severe strain on Ms. Nixon, causing her headaches and stress over potentially losing her job," which "interfered with her ability to" work. *Id.*

KPF moved to dismiss Nixon's amended hostile work environment claim. The district court granted the motion with prejudice, finding that Nixon failed to "sufficiently allege that the unsavory *conditions* of her job—rather than her *relationship*" amounted to a hostile work environment. *Nixon v. Kysela Pere Et Fils, Ltd.*, Civil Action No. 5:21-cv-00011, 2021 WL 3700253, at *3 (W.D. Va. Aug. 19, 2021). Last, KPF moved for summary judgment on the *quid pro quo* and breach of contract claims, which the district court granted. *Nixon v. Kysela Pere et Fils, LTD.*, Civil Action No. 5:21-cv-00011, 2022 WL 819562, at *14 (W.D. Va. Mar. 17, 2022).

Nixon timely appealed the dismissal of these claims, which we have jurisdiction to consider under 28 U.S.C. § 1291. We address each in turn, beginning with the Title VII claims.

7

II.

Title VII prohibits employers from discriminating against individuals with respect to their "compensation, terms, conditions, or privileges of employment" because of certain protected characteristics, including their sex. 42 U.S.C. § 2000e-2(a)(1). Title VII violations based on sexual harassment can give rise to at least two potential causes of action.

First, because "an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 207 (4th Cir. 2014) (citation omitted). And second, it creates a cause of action for *quid pro quo* sexual harassment—that is, a demand for sexual favors in return for a job benefit. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998).

A.

We first consider the district court's dismissal of Nixon's hostile work environment claim under Rule 12(b)(6). That rule permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). We review a district court's dismissal on that basis de novo, accepting all "well-pleaded, nonconclusory factual allegations" as true. *Hately v. Watts*, 917 F.3d 770, 781 (4th Cir. 2019) (citation omitted). If those allegations "raise a right to relief above the speculative level, thereby nudging the[] claims across the line from conceivable to plausible," then dismissal is improper. *Id.* (citations omitted).

For a hostile work environment claim to survive a 12(b)(6) motion to dismiss, a plaintiff must demonstrate: "(1) unwelcome conduct; (2) that is based on the plaintiff's [protected characteristic]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Okoli v. City Of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011) (citations omitted). In this case, we find the "severe or pervasive" element dispositive, so we limit our analysis to that inquiry.

Courts gauge the severity or pervasiveness of unwelcome conduct by considering whether it "create[s] an objectively hostile or abusive work environment," and whether the plaintiff "subjectively perceive[s] the environment to be abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). KPF does not dispute that Nixon subjectively perceived her work environment to be abusive, so we focus on the objective component. In determining objective hostility, courts assess the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.

A plaintiff "must clear a high bar in order to satisfy the severe or pervasive test." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). Title VII proscribes a work environment that is "permeated with discriminatory intimidation, ridicule, and insult"—conduct that is "[so] extreme [as] to amount to a change in the terms and conditions of employment." *Id.* (citations omitted). In general, "[s]imple teasing, offhand

9

comments, and isolated incidents (unless extremely serious)" are not actionable under Title VII. *Id.* (citations omitted).

Nixon made five allegations that, in her view, support a hostile work environment claim: (1) at times, Kysela singled her out for criticism during meetings; (2) on other occasions, he did not make her sales folders in advance of meetings; (3) he manufactured criticisms about her job performance and took accounts away from her; (4) after another employee sent her an explicit photograph, he forced her to sign a document foregoing her right to sue the employee; and (5) his actions "caus[ed] her headaches and stress over potentially losing her job." J.A. 87. Taking these allegations as true, we hold that they do not rise to the level of severe or pervasive conduct necessary to establish a hostile work environment claim.

First, Kysela's charged conduct is not sufficiently pervasive. Nixon alleged that in all her years at KPF, Kysela singled her out for criticism "at times," and on "other occasions," he did not make her sales folders for meetings.[2] *Id.* at 86. These isolated incidents do not amount to pervasive mistreatment under Title VII. *See, e.g.*, *Walker*, 775 F.3d at 209 (vacating summary judgment where plaintiff was subjected to sexual comments by co-workers "several times a week for well over a year"); *Okoli*, 648 F.3d at 220 (finding that employee "present[ed] a strong claim for hostile work environment" where "she suffered upwards of twelve . . . incidents in just four months"); *Sunbelt Rentals, Inc.*, 521

---

[2] Other than these vague statements, Nixon asserts no facts indicating the frequency of Kysela's alleged mistreatment.

10

F.3d at 316, 318 (reversing summary judgment where employee was subjected to "constant and repetitive abuse" that was "persistent, demeaning, unrelenting, and widespread" (citation omitted)).

Second, Kysela's purported conduct is not the severe harassment required to sustain a hostile work environment claim. *See, e.g.*, *Sunbelt Rentals, Inc.*, 521 F.3d at 316 (reversing summary judgment where co-workers called Muslim employee "harshly derogatory terms," such as "Taliban" and "towel head"); *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 170 (4th Cir. 2009) (reversing summary judgment where co-workers uttered "racial and gender epithets" around Black female employee); *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 305 (4th Cir. 2019) (reversing 12(b)(6) dismissal where employee alleged co-workers spread "humiliating" rumor that she was promoted in return for sexual favors, which created "open resentment and disrespect from her coworkers"). While Nixon's examples, if true, would undoubtedly show rude and callous behavior, such behavior is not unlawful under Title VII. *See Sunbelt Rentals, Inc.*, 521 F.3d at 315–16.

Finally, Nixon contends that "sex became an employment condition," which contributed to her hostile work environment. Op. Br. at 39; *see id.* at 39–40 (citing Kysela's pattern of firing and rehiring her). That assertion, however, supports Nixon's *quid pro quo* claim, not her hostile work environment claim. *See Ellerth*, 524 U.S. at 751 ("Cases based on threats which are carried out are referred to often as *quid pro quo* cases.").

Because Nixon fails to state a cognizable claim for hostile work environment, we affirm the district court's dismissal of that claim under Rule 12(b)(6).

11

B.

Next, we turn to Nixon's *quid pro quo* sexual harassment claim, which the district court dismissed on summary judgment grounds. Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if a reasonable jury could find for the nonmoving party—here, Nixon. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). "A fact is material if it might affect the outcome of the suit." *Id.* (internal quotation marks omitted). We review a district court's grant of summary judgment de novo, viewing the facts and all reasonable inferences in the light most favorable to the nonmovant. *Id.* at 312.

To establish a prima facie case for *quid pro quo* sexual harassment, a plaintiff must show: (1) she is a member of a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) her "reaction to the harassment affected tangible aspects of [her] compensation, terms, conditions, or privileges of employment"; and (5) the employer knew or should have known of the harassment but failed to take remedial action. *Okoli*, 648 F.3d at 222 (emphasis removed). The parties do not contest that Nixon, as a woman, is a member of a protected group. Nor do they contest that KPF, which is owned by Kysela, knew of Kysela's alleged behavior. Our analysis, then, turns on the remaining elements.

Regarding the second element, Nixon argues that Kysela subjected her to unwelcome sexual harassment. "The gravamen of any sexual harassment claim is that the alleged sexual advances were unwelcome." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S.

12

57, 68 (1986) (citation omitted). That question "presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." *Id.* The proper inquiry is whether the plaintiff, by her conduct, indicated that the advances were unwelcome. *Id.*

Nixon gives three examples of Kysela's unwelcome sexual harassment. First, before he rehired her in July 2019, she "made clear she did not want to be in a sexual relationship," but she eventually "gave in." Op. Br. at 17. Second, Kysela emailed Nixon requesting that they meet on a Sunday night "to discuss business," which she alleges was code for, "let's have sex." *Id.* at 19. Nixon resisted and called their relationship "over and done." *Id.* at 20. Third, after Nixon made that comment, Kysela responded, "[y]ou're the problem child. Behave and we will be fine." *Id.* at 22 (citation omitted) (emphasis removed).

The district court rejected these examples. It held that Nixon failed to establish "a genuine issue of material fact that Kysela made any unwelcome advances towards her after their consensual relationship ended." *Nixon*, Civil Action No. 5:21-cv-00011, 2022 WL 819562, at *8. The court reasoned that it was "undisputed that Nixon did not tell Kysela it was over until *after* he emailed her on September 23, asking if she would be available to see him the following Sunday." *Id.* at *9. Thus, the court posited, Kysela's purported advances "cannot be deemed unwelcome because [he] did not know that their relationship had ended." *Id.* at *10.

With respect to the third and fourth elements, Nixon maintains that Kysela's harassment, and her resulting termination, were based on her sex. The district court again

13

held that Nixon "failed to establish a genuine issue of material fact that Kysela terminated her employment because of her sex." *Id.* at *11. The court noted that "[t]he overwhelming evidence in the record demonstrates that any animus Kysela had against Nixon stemmed from his personal feelings and disappointment with the end of their relationship—not the fact that she is a woman." *Id.*

At the heart of the district court's decision is a premise presented as "undisputed"—"that Nixon did not tell Kysela it was over until *after* he emailed her on September 23, asking if she would be available to see him the following Sunday." *Id.* at *9. That premise underlies the court's holdings that (1) Kysela's potential advances could not "be deemed unwelcome because [he] did not know that their relationship had ended," *id.* at *10, and (2) Kysela's termination of Nixon's employment was not based on her sex, but rather on his "disappointment with the end of their relationship." *Id.* at *11.

That premise, however, is not established by the current record as undisputed. The date and manner in which the relationship ended is indeed heavily disputed. *Compare* J.A. 722–23 (Kysela testifying that they "both" ended it "[s]ometime early September" "way before" his Europe trip), *with id.* at 452–53 (Nixon testifying that she ended the relationship on September 29, after Kysela returned from Europe). True, certain documents in the record support Nixon's version of events. *See, e.g.*, *id.* at 1156 (Nixon and Kysela exchanging "Love you" text messages the week before Kysela's trip); *id.* at 456 (Nixon testifying that the same week, they spent two evenings together). But that version is contradicted by others. *See id.* at 1103 (Nixon stating in the relevant email exchange that, "We've said all that needs to be said. It's over and done," indicating a breakup prior to

14

Kysela's email). And at the summary judgment stage, the district court cannot weigh the contested evidence; it must only determine whether there is a genuine dispute of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

If this case came to us after a bench trial, our conclusion might be different. But while this is a close case, there is a genuine dispute of material fact over when the relationship ended. That fact is material to whether Kysela's advances were unwanted, and whether his termination of Nixon's employment was thus based on her sex or based on valid employment factors. This disputed issue bars summary judgment, as a reasonable jury could determine that Nixon was fired because of her rejection of Kysela's unwanted sexual advances. *See Ford v. Simms*, 23 F. App'x 152, 154 (4th Cir. 2001) (per curiam) ("[I]t is a fair reading of the facts alleged in the complaint that Logan sought to renew his sexual relationship with Miss Ford, was rebuffed, and took adverse actions against her because of it. We hold that such allegations state a claim under Title VII."). Therefore, we must vacate the judgment of the district court on the *quid pro quo* claim and remand for further proceedings.

III.

Finally, we reach Nixon's breach of contract claim, which the district court also dismissed at the summary judgment stage. We review a grant of summary judgment de novo, and in determining whether there is a genuine dispute of material fact, we view the facts and reasonable inferences in the light most favorable to Nixon. *See Libertarian Party of Va.*, 718 F.3d at 312–13.

15

Nixon's employment agreement with KPF is governed by Virginia law. To prevail on a breach of contract claim in Virginia, a plaintiff must demonstrate: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Navar, Inc. v. Fed. Bus. Council*, 784 S.E.2d 296, 299 (Va. 2016) (citations omitted). The parties do not dispute the enforceability of the employment agreement or an injury to Nixon, so our analysis boils down to whether KPF breached its obligation to Nixon.

The agreement established a three-year term of employment for Nixon, which could be terminated prematurely in the event of:

   a. Conduct by Nixon evidencing substance or alcohol abuse or dependency, disloyalty, dishonesty or any other conduct in contravention of the financial and business interests of [KPF]; or

   b. Nixon's failure to generate and attain minimum monthly sales of $70,000.00 per month by May 19th, 2020, which is nine (9) months from the beginning of this Agreement; or

   c. Nixon's breach of the terms and provisions hereof; or

   d. [KPF's] dissatisfaction with Nixon's job performance, at the discretion of Francis J. Kysela V, provided [KPF] gives Nixon a 30-day written notice.

J.A. 952.

Kysela fired Nixon a little over a month into her three-year term. In Nixon's view, the termination was unjustified under the contract: she refused Kysela's unwelcome sexual advances, so he fired her. Kysela, on the other hand, claims he terminated Nixon's

16

employment because he was "unhappy with her work performance," which would be a valid reason for early termination under the agreement. *Id.* at 725. Again, there is evidence supporting both positions. *Compare id.* at 867 (Kysela telling Nixon that he wanted her to stay at KPF because she was "a good sales agent" weeks before he fired her), *and id.* at 921 (Kysela telling Nixon she was a "very good business person and an asset[] to any company"), *with id.* at 988–89 (the Vice President of Sales at KPF stating that Nixon consistently failed to meet her sales goals).

Because there is a triable issue over whether Nixon's termination was based on her alleged rejection of Kysela's advances, there is necessarily a triable issue over whether KPF breached the contract. We therefore vacate the judgment of the district court on the breach of contract claim and remand for further proceedings.

IV.

For the foregoing reasons, we affirm the judgment of the district court dismissing Nixon's hostile work environment claim under Rule 12(b)(6). However, we vacate the court's judgment awarding summary judgment to KPF on Nixon's *quid pro quo* and breach of contract claims, and we remand for further proceedings in accordance with this opinion.

*AFFIRMED IN PART, VACATED AND REMANDED IN PART*